EXHIBIT 1

In the Matter of:

# IRENE KELLER

vs.

# HOWARD ANTHONY JAMES AND SE INDEPENDENT DELIVERY SERVICES, INC.

---

**Jack A. Keller**

October 28, 2025

---



www.spectrumcourtreporting.com
P.O. Box 1296
Mt. Pleasant, SC 29465

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

IRENE KELLER,

           Plaintiffs,

     vs.            CASE NO. 2:24-cv-05884-DCN

HOWARD ANTHONY JAMES AND SE INDEPENDENT
DELIVERY SERVICES, INC.,

           Defendants.

VTC VIDEO
DEPOSITION OF:   JACK A. KELLER

DATE:            October 28, 2025

TIME:            10:00 AM


LOCATION:        Morgan & Morgan
                 4401 Belle Oaks Drive
                 Suite 300
                 North Charleston, SC

TAKEN BY:        Counsel for the Defendants

REPORTED BY:     Priscilla deJesus,
                 Court Reporter

EXHIBIT 1

Page 2

```
 1    APPEARANCES OF COUNSEL:

 2         ATTORNEYS FOR THE PLAINTIFF
                IRENE KELLER:
 3
                MORGAN & MORGAN
 4              BY:  COOPER KLAASMEYER
                4401 Belle Oaks Drive
 5              Suite 300
                North Charleston, SC
 6              (843)973-5438
                cooper.klaasmeyer@forthepeople.com
 7

 8         ATTORNEYS FOR THE DEFENDANTS
                HOWARD ANTHONY JAMES AND SE
 9              INDEPENDENT DELIVERY SERVICES, INC.:

10              SWEENY, WINGATE & BARROW, PA
                BY:  AARON J. HAYES
11              PO Box 12129
                Columbia, SC  29211
12              (803)256-2233
                ajh@swblaw.com
13

14    and

15
           ATTORNEYS FOR DEFENDANT
16              SE INDEPENDENT DELIVERY SERVICES:

17              BY:  KENDYL TASH - CORPORATE COUNSEL
                    (Appearing remotely via VTC)
18              11540 E US Highway92
                Seffner, FL 33584
19              (813)623-5400
                ktash@seids.com
20

21
           ALSO PRESENT:
22
                Christoper Mills, Videographer
23

24

25
```

EXHIBIT 1

```
 1                    I N D E X

 2

 3                                    Page      Line

 4

 5    JACK ANDREW KELLER              4          5

 6    EXAMINATION                     4          7

 7    BY MR. HAYES

 8    CERTIFICATE OF REPORTER        110         1

 9

10

11                  E X H I B I T S

12              (No Exhibits Proffered)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 1

Page 4

```
 1              THE VIDEOGRAPHER:  We're now on the
 2    record.  Today's date is October the 28th, 2025.
 3    The time is approximately 10:00 AM.  Will our court
 4    reporter swear in the witness.
 5                    JACK ANDREW KELLER
 6    being first duly sworn, testified as follows:
 7                      EXAMINATION
 8    BY MR. HAYES:
 9         Q.   Mr. Keller, my name is Aaron Hayes.
10    I represent the two Defendants to this lawsuit,
11    Mr. Howard James and Southeast Independent Delivery
12    Services.  This lawsuit is filed by your wife Irene
13    Hope Keller.  I believe she goes by Hope.  Is that
14    correct?
15         A.   That is correct.
16         Q.   Okay.  And I'm here to take your
17    deposition today to see what you know about this
18    situation and what you know about Mrs. Keller's
19    treatment.  Okay?
20         A.   Okay.
21         Q.   Mr. Keller, have you ever given a
22    deposition before?
23         A.   Once, yes.
24         Q.   Okay.  What kind of case was that?
25         A.   It was a work-related accident case.
```

EXHIBIT 1

1      Q.   Okay.  And were you a witness or were

2  you a party to that proceeding?

3      A.   I was a party to that.

4      Q.   Okay.  So it's probably the same set

5  of rules that applied the first time you gave a

6  deposition --

7      A.   Uh-huh.

8      Q.   -- but just for the record, I'm going

9  to go over them very quickly.  Okay?

10      A.   Okay.

11      Q.   Our court reporter here is taking a

12  written record of everything that is said.  So

13  that means a couple of things.  One, even if you

14  nod your head yes or shake your head no, I'll

15  understand what you meant because I'm sitting

16  right across from you.  But that's hard for her to

17  take down.  Okay?

18      A.   Understood.

19      Q.   So you've got to provide a verbal

20  answer.  And if I remind you to do that or if

21  she reminds you to do that, we're not being rude.

22  We've just got to have a clear transcript.  Okay?

23      A.   That's fine.

24      Q.   And the next thing is, it's difficult

25  for her to take down if two people are talking at

1    once.  Okay?

2         A.   Yes, sir.

3         Q.   So if you would, do me a favor.  If you

4    would, wait for me to finish my question before you

5    start your answer, and I will wait for you to

6    finish your last answer before I ask my next

7    question.  Okay?

8         A.   Fair enough.

9         Q.   Mr. Keller, I don't think we're going

10   to be here too long today.  I do have some ground

11   to cover, but I don't think it's going to be an

12   all-day event.

13        A.   Okay.

14        Q.   So -- but -- but in any event, if you

15   need a break at any time just let me know and we'll

16   take a break.

17        A.   Yes, sir.  Thank you.

18        Q.   One thing I do ask is, let's not take

19   a break between a question and an answer.  Let's

20   wait until you've finished answering the last

21   question on the table before we take a break.

22   Okay?

23        A.   Okay.

24        Q.   If we do take a break, the deposition

25   is still in progress which means if you have any

EXHIBIT 1

Page 7

1 conversations about the case with your wife or your

2 wife's attorney or anybody else I'll have a chance

3 to ask you about that.  Okay?

4   A.  Okay.

5   Q.  So now that the deposition has

6 commenced, you can't have any private conversations

7 about this situation with anybody.  All right?

8   A.  All right.

9   Q.  Also, you -- throughout the deposition

10 you may hear Mr. Klaasmeyer if I'm asking questions

11 or me if he's asking questions issue an objection

12 to one of the questions.  That's something that the

13 attorneys have to do for court purposes.

14    So if you hear the word objection just

15 ignore it and answer the question to the best of

16 your ability.  Okay?

17   A.  Okay.

18   Q.  But if at any point I ask you a

19 question and you don't understand what I'm

20 asking --

21   A.  Yes, sir.

22   Q.  -- which is very possible, just ask me

23 to clarify and I will.  Okay?

24   A.  Yes, sir.

25   Q.  On the other hand, if I ask you a

EXHIBIT 1

Page 8

```
 1   question and you begin to answer it, I'm going to
 2   assume that you understood what I was asking.
 3   Okay?
 4        A.   Yes, sir.
 5        Q.   Okay.  Mr. Keller, can you give me your
 6   full name, please.
 7        A.   Jack Andrew Keller.
 8        Q.   And what's your date of birth?
 9        A.   ██████████
10        Q.   So two days away from your birthday?
11        A.   Yes, sir.
12        Q.   And what -- what birthday is that going
13   to be?
14        A.   Sixty-three.
15        Q.   All right.  And what's your Social
16   Security number, sir?
17        A.   ██████████
18        Q.   And what is your cell phone number?
19        A.   ██████████
20        Q.   Is that the same cell phone number you
21   had back in February of 2024 when this accident
22   happened?
23        A.   Yes.
24        Q.   Who is your cell phone carrier?
25        A.   AT&T.
```

EXHIBIT 1

Page 9

```
 1          Q.   Is that the same cell phone carrier you

 2     had back in February of 2024?

 3          A.   Yes.

 4          Q.   Who is the account holder on that AT&T

 5     plan?  Is it you or is it a family account?

 6          A.   I believe it's a family account, but

 7     I'm trying to think of who -- whose name the bill

 8     comes under.  I can't really remember, even though

 9     I pay it every month.

10          Q.   Okay.

11          A.   It -- it might be addressed to my wife.

12          Q.   And what's your current address, sir?

13          A.   ██████████████████████████████████

14     ██████████████████████████

15          Q.   How long have you lived at that

16     address?

17          A.   For three years.

18          Q.   And it's my understanding that your

19     wife lives there with you?

20          A.   Yes.

21          Q.   And it's also my understanding that

22     there are other houses on that property.  Right?

23          A.   My youngest son has a house there, yes.

24          Q.   Okay.  So within the four walls of your

25     house it's just you and your wife.  Correct?
```

EXHIBIT 1

Page 10

```
 1          A.    Correct.

 2          Q.    But elsewhere on the property is

 3   another house with your son?

 4          A.    Yes.

 5          Q.    And who lives with him?

 6          A.    His wife.

 7          Q.    Mr. Keller, where are you from

 8   originally?

 9          A.    Originally Cincinnati, Ohio area.

10          Q.    How long have you been in South

11   Carolina?

12          A.    Since 1993.

13          Q.    What bought you from Ohio to South

14   Carolina originally?

15          A.    Work.

16          Q.    Okay.  And what -- what industry was

17   that that brought you from Ohio to South Carolina?

18          A.    Specifically automotive painting and

19   paint systems, set up --

20          Q.    Okay.

21          A.    -- and managing.  Process engineering

22   to be exact.

23          Q.    So what company were you working for

24   that originally brought you from Ohio to South

25   Carolina?
```

EXHIBIT 1

Page 11

1        A.    Well, the -- the company I was working

2   for at that time that recruited me was a company

3   named McKechnie Plastic Components.

4        Q.    Okay.  So that kind of brings me to my

5   first topic for you.  I just want to talk about

6   just your -- your general history --

7        A.    Okay.

8        Q.    -- as far as education and employment.

9        A.    Uh-huh.

10       Q.    Did you attend high school?

11       A.    Yes.

12       Q.    Did you graduate?

13       A.    Yes.

14       Q.    What year?

15       A.    1981.

16       Q.    What high school?

17       A.    Middletown High School.

18       Q.    Is that in Middletown, Ohio?

19       A.    That's correct.

20       Q.    Did you attend any education after high

21   school?

22       A.    Yes.

23       Q.    What institutions?

24       A.    ITT Technical Institute.

25       Q.    Did you graduate?

EXHIBIT 1

Page 12

```
 1          A.   Yes.

 2          Q.   What year?

 3          A.   Man.  It was like 1982 or '83.  I can't

 4     really recall the exact date.

 5          Q.   Okay.  And what degrees, diplomas or

 6     certifications did you receive from ITT?

 7          A.   It was a technical degree in -- in

 8     HVAC, heating, air conditioning.

 9          Q.   Okay.  Did you attend any education

10     after ITT?

11          A.   Yes.

12          Q.   Okay.  What institutions?

13          A.   Trident Technical College.

14          Q.   Okay.  And where is that?

15          A.   In North Charleston.

16          Q.   Okay.  Oh.  Our Trident --

17          A.   Yes.

18          Q.   -- Technical College?  Okay.  What year

19     did you graduate?

20          A.   I did not graduate.

21          Q.   What years did you attend?

22          A.   That would have been in 2013/2014.

23          Q.   Okay.  So you went back to school?

24          A.   Yes.

25          Q.   And what were you studying at Trident
```

EXHIBIT 1

Page 13

1    Tech?

2           A.    Culinary Institute.

3           Q.    Okay.  Culinary?

4           A.    Uh-huh.

5           Q.    Okay.  And how many -- how many years

6    did you attend?

7           A.    It was actually, I believe, two

8    semesters.

9           Q.    And what -- what certificate or degree

10   or diploma program were you enrolled in?

11          A.    There was -- I mean, it was a -- an

12   associate's degree.  That's what I was pursuing at

13   that time.

14          Q.    Okay.  And you did not complete it.

15   What not?

16          A.    No, sir.  I was involved in a

17   work-related injury that pretty much would not

18   allow me to attend school.  I wasn't able and I'm

19   still not able to lift heavy things, bending

20   standing, sitting too long.  I mean, I did try.

21   I just wasn't able.

22          Q.    Okay.  So any other educational

23   institutions attended besides the ones we've talked

24   about?

25          A.    FANUC Robotics for robotic programming,

EXHIBIT 1

Page 14

1    specifically applying to automotive painting.

2            Q.    And can you spell the name of that.

3            A.    FANUC.  F-A-N-I-C, I believe, or U-C.

4    FANUC.

5            Q.    Okay.  And is that and is that like

6    a -- a industry-sponsored --

7            A.    They are --

8            Q.    -- institution?

9            A.    They are a manufacturer of -- of robots

10   obviously and they have seminars.  I believe it was

11   up in Detroit, Michigan and it's a two-day seminar,

12   three-day seminar.

13           Q.    Okay.  And what years did you attend

14   those?

15           A.    Testing my memory.  I don't have an

16   exact date.  It was I want to say early -- early

17   1990s.

18           Q.    Okay.  I also want to ask you some

19   questions about your employment history.

20           A.    Yes, sir.

21           Q.    And we're going to go as far back as we

22   can starting with your first job out of ITT and --

23   and moving forward to present.  Okay?

24           A.    Yes.

25           Q.    So can you tell me, what was your first

EXHIBIT 1

Page 15

1    job out of ITT?

2          A.    That was with Glenn Moon Heating and

3    Air Conditioning.

4          Q.    Were you a technician with them?

5          A.    Yes.

6          Q.    And how long were you with them?

7          A.    Approximately six months.

8          Q.    And was that in Ohio?

9          A.    That was in Clearwater, Florida.

10         Q.    Okay.  So you moved from Ohio to

11   Florida?

12         A.    That's correct.

13         Q.    Okay.  And where did you go after Glenn

14   Moon?

15         A.    I went back -- I went to work for

16   Chuck's Heating & Air service.

17         Q.    And where was that?

18         A.    It's in Middletown, Ohio.

19         Q.    So you went to school in Ohio, took a

20   job in Florida and --

21         A.    Correct.

22         Q.    -- then back to Ohio?

23         A.    Correct.

24         Q.    And how long were you -- how long were

25   you with Chuck's Heating & Air?

EXHIBIT 1

Page 16

```
 1          A.    Approximately two years.
 2          Q.    And where did you go next?
 3          A.    That would have been a company called
 4   Mikola Foods.
 5          Q.    And what were you doing for them?
 6          A.    That was a door-to-door steak and
 7   seafood sales company.
 8          Q.    Okay.  Were you a salesman?
 9          A.    Yes.
10          Q.    Okay.  And how long did you do that?
11          A.    Approximately a year.
12          Q.    And what was your next stop?
13          A.    That would be or thing stop plastics.
14   Worthington Plastics.  Worthington Custom Plastics.
15          Q.    And was your next job in Ohio?
16          A.    Yes, sir.
17          Q.    And what were you doing there?
18          A.    I was a painter.
19          Q.    And how long?
20          A.    Ten years.
21          Q.    Okay.  And where did you go from
22   Worthington Custom Plastics?
23          A.    From Worthington I went to McKechnie
24   Plastic Components in Easley, South Carolina.
25          Q.    Okay.  And so that's the job that
```

EXHIBIT 1

Page 17

1    brought you to South Carolina?

2         A.    That's correct.  Yes, sir.

3         Q.    And so tell me the name of that company

4    again.

5         A.    McKechnie.

6         Q.    And what town is that in?

7         A.    Easley, South Carolina.

8         Q.    Oh.  Oh.  You said Easley?

9         A.    Yes, sir.

10        Q.    Got you.  And what were you doing for

11   them?

12        A.    I started off as a paint process

13   engineer.

14        Q.    And what year did you start working for

15   them?

16        A.    It was in early 1993/'94, I believe.

17        Q.    And you've been in South Carolina ever

18   since?

19        A.    Well, yes and no --

20        Q.    Okay.

21        A.    -- because my career has taken me

22   through a few states --

23        Q.    Okay.  And -- and we'll get there.

24   I --

25        A.    Okay.

EXHIBIT 1

Page 18

```
 1          Q.   I didn't mean to skip ahead.  So how
 2   long were you with McKechnie Custom Plastics?
 3          A.   That was approximately two and a half,
 4   three years, I believe.
 5          Q.   And where did you go from there?
 6          A.   From there I went to a company called
 7   IVC, Integrative Vacuum Coatings.
 8          Q.   And how -- and what were you doing
 9   there?
10          A.   I was their operations manager.
11          Q.   And how long were you there?
12          A.   Approximately a year.
13          Q.   And where was that located?
14          A.   That would have been Rincon, Georgia.
15          Q.   And what was your next stop?
16          A.   From there I went to guardian
17   automotive.
18          Q.   And what were you doing at Guardian
19   Automotive?
20          A.   I was a -- a paint process engineer.
21          Q.   And how long were you there?
22          A.   I was with Guardian for -- 1998.  So
23   that would have been I want to say roughly five
24   years.
25          Q.   Okay.  And what city and state was that
```

EXHIBIT 1

Page 19

1    located in?

2          A.    LaGrange, Georgia.

3          Q.    And where did you go from Guardian?

4          A.    I went to a -- a company.  I'm trying

5    to remember their name.  They're located in

6    Winnsboro, South Carolina and I -- for the life

7    of me, I cannot remember their name.

8          Q.    Okay.  Doing what?

9          A.    Their paint operations manager.

10          Q.    And how long were you in Winnsboro?

11          A.    Ninety days.

12          Q.    Ninety days?

13          A.    Yes.

14          Q.    What happened there?

15          A.    Why it was so short?

16          Q.    Yes.

17          A.    The company -- during the interview

18    process they did not tell me they were involved

19    in a hostile takeover and basically they --

20    they would not allow me to implement anything,

21    any changes to their paint operation to improve

22    their process.

23                So they literally did not need me if

24    they wanted to stay current state.  So I reached

25    out to my Vice President or former Vice President

EXHIBIT 1

Page 20

```
 1   of Guardian Automotive and asked if there was a

 2   position I could return back into the fold of the

 3   company and he said yes.

 4           Q.   Okay.  So you went back to Guardian?

 5           A.   Yes.

 6           Q.   In that second stint, how long were you

 7   at Guardian?

 8           A.   That would have been I want to stay

 9   three -- three additional years with Guardian.

10           Q.   And that's back in LaGrange?

11           A.   That was in Morehead, Kentucky.

12           Q.   Okay.  And where did you go after

13   that second -- second period of employment from

14   Guardian?

15           A.   From Guardian there was a -- a -- a

16   draw-down.  You know, a layoff.  So let's see.  I

17   went to -- actually to -- back to Florida and went

18   to work for a Texaco gas station.

19           Q.   Okay.  Doing --

20           A.   Pumping gas.  You know, running the

21   cash-register-type thing.

22           Q.   And what year were you working for the

23   Texaco gas station?  Do you remember?

24           A.   I honestly cannot recall the year.  I'm

25   sitting here trying to think.  It was -- well, it
```

EXHIBIT 1

Page 21

1    was 2001 because I remember that -- we were there

2    for the -- during 911.

3          Q.   Got you.  How long were you at the --

4    and what city and state was that --

5          A.   That was in --

6          Q.   I know you said Florida.  What city was

7    that in?

8          A.   -- Crystal River.

9          Q.   How long were you there?

10         A.   Approximately nine months.

11         Q.   And where did you go from there?

12         A.   Went to work for a company.  I'm trying

13   to remember the name of it, but it was a -- a

14   friend of mine who was managing this company in --

15   in Villa Rica, Georgia.  Linetec was the name.

16         Q.   L-I-N-E-T-E-C-H?

17         A.   Yes.

18         Q.   And what did you do for them?

19         A.   I was their operations manager.  Their

20   paint operations manager.

21         Q.   And how long were you there?

22         A.   I believe it was probably around two

23   and a half years.  Two years.

24         Q.   And what city was that in?

25         A.   Villa Rica, Georgia.

Page 22

```
 1          Q.    And where did you go from Linetec?

 2          A.    From Linetec we went to a company

 3   called Tennplasco.

 4          Q.    T-E-M-P --

 5          A.    Plasco.  Just how it sounds.  Yeah.

 6          Q.    L-A-S-C-O?

 7          A.    Yes.

 8          Q.    And what did you do for them?

 9          A.    I was their paint operations manager.

10          Q.    And for how long?

11          A.    That was a three-year gig.

12          Q.    And city and state?

13          A.    They were located in Lafayette,

14   Tennessee.

15          Q.    So you weren't kidding when you said

16   you've moved around a lot.

17          A.    You become like a hired gun almost.

18          Q.    Okay.  From Tennplasco where did you

19   go?

20          A.    From Tennplasco I came down to here in

21   Charleston -- actually Ladson -- to a company

22   called American LaFrance.

23          Q.    And what -- what were you doing for

24   them?

25          A.    I was their -- their paint department
```

EXHIBIT 1

Page 23

1    manager/process engineer.

2          Q.    And how long were you there?

3          A.    That was from 2006 to 2012, 2013.

4          Q.    Okay.  So we'll call that seven or

5    eight years?

6          A.    Yes, sir.  Roughly.

7          Q.    And where did you go from there?

8          A.    From there I ended up at a company

9    called Rotorion and that was also in Ladson.

10         Q.    And what were you doing for them?

11         A.    I was their paint department manager.

12         Q.    And are all these automotive painting

13   companies?

14         A.    All except Tennplasco.  Tennplasco is

15   not an automotive.

16         Q.    Okay.

17         A.    They -- they did injection molding for

18   the audio-visual, primarily for like Toshiba

19   televisions.

20         Q.    Okay.

21         A.    Frames.

22         Q.    Okay.  So Rotorion, how long were you

23   there?

24         A.    Rotorion, I was there just a little

25   over a year.  Well, yeah.  That's where my -- my

EXHIBIT 1

Page 24

1   accident occurred.

2        Q.   Is that the -- are you currently

3   employed?

4        A.   No, sir.  I'm retired.

5        Q.   Was Rotorion the last -- last place you

6   had paid employment?

7        A.   Yes.

8        Q.   And what year did your injury occur?

9        A.   2014.

10       Q.   Okay.  And what was the nature of that

11  injury?

12       A.   I slipped on ice cubes and it messed up

13  the discs in my lower back and tore two ligaments

14  in my left knee.

15       Q.   Okay.  Was that ice cubes that they

16  were using in some kind of industrial application

17  or was that like ice cubes in a break room?

18       A.   It was ice cubes not necessarily in a

19  break room, but it was in the -- the cafeteria is

20  here and there's an aisleway and the machine was

21  located along that aisleway.  (Motioning)

22       Q.   So you slipped on ice cubes --

23       A.   Yes.

24       Q.   -- and had a disc injury to -- to your

25  lumbar spine.  Is that correct?

EXHIBIT 1

Page 25

```
 1          A.    Yeah.  Several discs actually.

 2          Q.    Do you know how many discs were

 3   involved?

 4          A.    According to my doctor at the time it

 5   was L4 through S1, I believe.

 6          Q.    And then you also had ligament

 7   damage --

 8          A.    Yeah.

 9          Q.    -- to your knee?

10          A.    My left knee.  The meniscus tears on

11   like either side.

12          Q.    Okay.  Did you file a workers'

13   compensation claim?

14          A.    Yes.

15          Q.    Did you file a disability claim --

16          A.    Eventually, yes.

17          Q.    Okay -- when the worker's compensation

18   was over?

19          A.    Yes.

20          Q.    And were you granted disability?

21          A.    Yes.

22          Q.    Permanent?

23          A.    Yes.

24          Q.    And are you still on disability?

25          A.    Yes.
```

EXHIBIT 1

Page 26

```
 1          Q.    What is your payment per month?

 2          A.    Pre-tax?

 3          Q.    Yes.

 4          A.    I believe it was somewhere in the

 5     neighborhood of about 3,200.  Something of that

 6     nature.

 7          Q.    And I assume you have -- and so was

 8     that granted for knee, back or both?

 9          A.    Both.

10          Q.    Did you have an attorney help you with

11     the workers' compensation claim?

12          A.    Yes.

13          Q.    Who was that?

14          A.    He was a member of the Joye Law Firm.

15          Q.    Okay.  Did the Joye Law Firm also help

16     you with the disability claim?

17          A.    That was a separate attorney

18     recommended to me by Joye.

19          Q.    Okay.  And what attorney was that?

20          A.    I cannot recall her name.

21          Q.    Was she here in the Charleston area?

22          A.    Yes.

23          Q.    And do you remember the date that your

24     application for permanent disability was granted?

25     So about the time that the -- the payments started.
```

EXHIBIT 1

Page 27

```
1          A.   I don't recall the exact date.  The

2    approximate date I -- I believe was somewhere in

3    2015/2016 --

4          Q.   Okay.

5          A.   -- year.

6          Q.   Got you.

7          A.   I don't recall the exact.  It was

8    a -- it was a couple-year process, though, I

9    believe --

10         Q.   Okay.

11         A.   -- to the best of my recollection.

12         Q.   Have you sought paid employment since

13   then?

14         A.   No.

15         Q.   Other than the workers' compensation

16   claim and the disability claim have you been --

17   ever been involved in a legal proceeding either as

18   a Plaintiff or a Defendant?

19         A.   Yes.

20         Q.   Okay.  And were those injury actions or

21   were those other type of actions?

22         A.   It was an auto accident --

23         Q.   Okay.

24         A.   -- type of thing.

25         Q.   So tell me about that.
```

EXHIBIT 1

Page 28

1          A.    This is going way back.  This is going

2    back when I was working at Worthington Custom

3    Plastics in Ohio.  I was on my way to work one

4    morning and stopped at a red light and was going

5    to make a right-on-red turn.  And there was a truck

6    parked next to me, stopped at the same light.  I

7    was in the process of making my turn.

8               I didn't know the light had turned

9    green, but next thing I know this truck was turning

10   over on top of me literally.  It was a semi-tractor

11   trailer-type thing.  He proceeded to grab the --

12   the front end of my vehicle, chilled (sic) it up,

13   suck it in underneath the trailer.  Eventually he

14   did stop, thank God, but --

15          Q.    Okay.  So what year was that

16   approximately?

17          A.    I'm going to say approximately like

18   1990.  Somewhere in that era.

19          Q.    And did you hire an attorney?

20          A.    Yes.

21          Q.    Did you file a lawsuit?

22          A.    Can you define the lawsuit?  I mean, we

23   went to court over it.

24          Q.    And so I assume that that must have

25   been a lawsuit --

EXHIBIT 1

1          A.    Okay.

2          Q.    -- if you were in court.

3          A.    Yes, sir.

4          Q.    Did that go all the way through trial

5    or did it settle before the jury picked an amount?

6          A.    No.  It -- it went before a judge.

7    There was -- there was no jury.

8          Q.    Oh, okay.  And was it a situation where

9    the judge awarded a particular amount?

10         A.    I'm going to have to say yes.  I -- I

11   don't really know --

12         Q.    Okay.

13         A.    -- if the judge made that decision or

14   not.

15         Q.    Did you ultimately receive money as a

16   result of that proceeding?

17         A.    Yes.

18         Q.    Do you remember how much?

19         A.    I don't recall the -- the exact amount.

20   It wasn't a great deal.

21         Q.    What kind of injuries did you sustain

22   in that wreck?

23         A.    It -- it pertained to like my -- my

24   upper back, I guess, from being -- when the seat

25   belt locked in.  You know, the jerking around.

EXHIBIT 1

Page 30

```
1          Q.    Okay.  So any other lawsuits that --

2          A.    No.

3          Q.    -- you've been involved in?

4          A.    No, sir.

5          Q.    All right.  We've talked about your

6    education.  We've talked about your employment.

7    I do want to ask you some additional questions

8    about your background.  Okay?

9          A.    Okay.

10         Q.    So we know you are married to Mrs.

11   Hope Keller.

12         A.    Yes.

13         Q.    Do you have any children?

14         A.    Yes.

15         Q.    How many?

16         A.    Four.

17         Q.    Are any of those -- and I -- I -- I

18   believe from Mrs. Keller's deposition she told us

19   that none of those are in common with her.  Is that

20   correct?

21         A.    Define that.

22         Q.    Is Mrs. Keller the mother of any of

23   your children?

24         A.    Yes.

25         Q.    Okay.  And I must have misread that.
```

Page 31

1      I'm sorry, and I'm speaking biologically.

2           A.   Yes.

3           Q.   Okay.  So how many biological children

4      do you have with Mrs. Hope Keller?

5           A.   None of the -- the children with her

6      are -- are my biological children.  She's their

7      biological mother.

8           Q.   Okay.  Do you have any biological

9      children?

10          A.   Yes.

11          Q.   Okay.  How many?

12          A.   One.

13          Q.   And what's his or her name?

14          A.   Chassidy.

15          Q.   And where does Chassidy live?

16          A.   Greenville, South Carolina.

17          Q.   And what's her last name?

18          A.   Lyles.

19          Q.   L-Y-L-E-S?

20          A.   Yes, sir.

21          Q.   Is she married?

22          A.   Yes.

23          Q.   And what's her husband's name?

24          A.   Trey.

25          Q.   And do they have children?

EXHIBIT 1

Page 32

```
 1          A.    Yes.

 2          Q.    How many?

 3          A.    She has two children.

 4          Q.    And are those two children under the

 5     age of 18?

 6          A.    No.

 7          Q.    Okay.  So if you could give me their

 8     names, please.

 9          A.    Samantha and I'm trying to -- she just

10     got married.  So I -- I really don't know her

11     husband's last name.

12          Q.    Oh, okay.

13          A.    That's I terrible, but I don't recall

14     it.

15          Q.    When was the wedding?

16          A.    I think it was three weeks ago.

17          Q.    Oh, okay.

18          A.    They're recently married.

19          Q.    Where was it?

20          A.    It was in Greenville.

21          Q.    And what's your other grandchild's name

22     from Chassidy?

23          A.    Cole.  Cole.  C-O-L-E.  Last name

24     Allen.

25          Q.    And where does he live?
```

Page 33

```
 1          A.    In Greenville, South Carolina.

 2          Q.    And you -- you probably already know

 3   this, but the reason we ask these kind of questions

 4   is because if this case were to go to trial --

 5          A.    Uh-huh.

 6          Q.    -- the jury would be selected from this

 7   region of the state.

 8          A.    Uh-huh.

 9          Q.    Not as far as Greenville but Lowcountry

10   couties.

11          A.    Okay.

12          Q.    And so we just have to make sure who's

13   related to who so that the people who wind up on

14   the jury aren't related to you --

15          A.    Uh-huh.

16          Q.    -- or my client or anything like that.

17          A.    Okay.

18          Q.    So you have one biological child,

19   Chassidy Lyles, in Greenville.  Correct?

20          A.    That's correct.

21          Q.    And you have three stepchildren I -- I

22   understand?

23          A.    There are no steps in our family.

24          THE COURT REPORTER:  I'm sorry.  I

25   didn't hear you.
```

EXHIBIT 1

Page 34

```
 1                THE WITNESS:  There are no steps in our
 2    family.
 3    BY MR. HAYES:
 4         Q.   Okay.
 5         A.   I don't refer to them as stepchildren.
 6         Q.   Okay.
 7         A.   They're my children.
 8         Q.   I understand.  Legally they'll be
 9    considered stepchildren, but you consider them your
10    children?
11         A.   No.  I have adopted them.  They're --
12         Q.   Oh.  You have adopted them?
13         A.   Yes.
14         Q.   Okay.  Oh.  You know what?  I do
15    remember reading that in --
16         A.   Okay.
17         Q.   -- Mrs. Hope Keller's deposition and
18    I'm sorry for my confusion on that issue.
19         A.   That's fine.
20         Q.   And have you been married prior to
21    Mrs. Hope Keller?
22         A.   Yes.
23         Q.   How many times?
24         A.   Once.
25         Q.   Okay.  And what was her name?
```

EXHIBIT 1

Page 35

1          A.    Christine.

2          Q.    And where does she live?

3          A.    Greenville, South Carolina.

4          Q.    Okay.  And how long were you married to

5     Christine?

6          A.    Approximately 10 or 11 years.

7          Q.    And when did you get divorced from

8     Christine?

9          A.    That would have been in the early --

10    early to mid '90s.  I don't recall the exact date.

11         Q.    Okay.  And how long have you been

12    married to Mrs. Hope Keller?

13         A.    Since 2002.

14         Q.    And how did y'all meet?

15         A.    Through work.

16         Q.    Where were you working at the time?

17         A.    That would have been IVC in Rincon,

18    Georgia.

19         Q.    Did y'all work in the same department

20    or --

21         A.    Yes.

22         Q.    -- was it similar jobs?  What -- what

23    were you doing for IVC and what was she doing?

24         A.    I was their -- their paint operations

25    manager and she was a painter.

EXHIBIT 1

Page 36

```
 1          Q.   Okay.  So y'all married in 2002.  And
 2   what year did y'all meet?
 3          A.   That would -- that would have been in
 4   the -- in the late '90s --
 5          Q.   Okay.
 6          A.   -- when I was -- when I was at IVC.
 7   That's how we met.
 8          Q.   Okay.  Got you.  But you had moved on
 9   to a different company when y'all actually got
10   married?
11          A.   Yes.  I was in LaGrange, Georgia.  She
12   remained in Rincon.  So there was approximately two
13   years or so that followed before we decided -- she
14   came over to visit mutual friends and never went
15   back.
16          Q.   Okay.  So y'all met at IVC, but y'all
17   were not dating while --
18          A.   No.
19          Q.   -- you were at IVC?
20          A.   No.
21          Q.   Just one moment.
22          A.   Uh-huh.
23          Q.   Mr. Keller, have you ever been arrested
24   before?
25          A.   Yes.
```

EXHIBIT 1

Page 37

1          Q.    How many times?

2          A.    Twice.

3          Q.    All right.  The first time you got

4    arrested, what was it for?

5          A.    That was for a driving while

6    intoxicated.  DUI.

7          Q.    And what year was that?

8          A.    Oh, man.  That's -- I don't recall the

9    exact year, but it was -- it was in mid -- or mid

10   '80s. Somewhere in that area.

11         Q.    Okay.

12         A.    It was -- it's a long time ago.

13         Q.    Got you.  And what was the second time

14   you got arrested?

15         A.    It was for like I want to say -- I

16   don't know.  It was a noise complaint.  The

17   neighbors -- neighbors at -- in my hotel or -- not

18   hotel, but apartment.  My girlfriend and I at the

19   time were having an argument.

20               So they -- they called the police and

21   pretty much determined that we were both at fault

22   for disturbance, domestic.  Whatever the -- I can't

23   remember the exact charge, but it was ultimately

24   dismissed.

25         Q.    And what year was that?

EXHIBIT 1

Page 38

1       A.    Somewhere in the neighborhood of 1997.

2       Q.    Okay.

3       A.    '96.

4       Q.    So those are the only two times?

5       A.    Yes, sir, to my recollection.  I don't

6    recall anything else.

7       Q.    Okay.  Have you ever been involved in

8    any car wrecks before in addition to the one you

9    told me about where you had to get a lawyer back in

10   Ohio?

11      A.    There was -- the -- the result of the

12   DUI was there was a -- that was a part of a wreck

13   where a car had slid in the snow and hit us.

14      Q.    Got you.  Any other car wrecks?

15      A.    I don't believe so.

16      Q.    Any other workers' compensation claims

17   that you filed besides the one that you told me

18   about that resulted in the finding of permanent

19   disability?

20      A.    There -- there was -- I know there was

21   at least one more and I'm trying to go back through

22   because I got -- I got hurt once at Worthington

23   where a -- a airline blew off of a paint gun when I

24   was using.  It hit me in the elbow and they sent me

25   the clinic for that.  Sorry.  There's something in

Page 39

```
 1   my eye.  And then I -- while I was at American

 2   LaFrance I was pulling myself up into the cab of

 3   a fire truck and something happened in my right

 4   shoulder.  It popped and I -- I had to go to

 5   physical therapy for that.

 6          Q.   Did either one of those workers'

 7   compensation claims result in payments to you?

 8          A.   No.

 9          Q.   Have you ever been terminated from any

10   of the jobs that you told me about?

11          A.   Yes.

12          Q.   Which ones?

13          A.   The IVC was a -- was a termination.

14   That was basically a corporate downsize.  Guardian

15   Automotive was a termination.

16          Q.   Why?

17          A.   Sir?

18          Q.   Why?

19          A.   That was -- again was as a result of

20   a downsize and I want to say -- I want to say the

21   Linetec was -- was as -- was the same company that

22   decided they have -- they have too many people and

23   you make a certain salary, the quickest way to I

24   generate income to the bottom line is to eliminate

25   people that earn the most.
```

EXHIBIT 1

Page 40

1          Q.    Okay.  Have you ever been sued before?

2          A.    No.

3          Q.    Mr. Keller, what's your state of

4    licensure and driver's license number?  And feel

5    free to take a look if you don't --

6          A.    Yeah.  I couldn't recall that even on

7    a bet.  Hold on one second.  I did not bring my

8    eyes in with me.  So bear with me here.  They're

9    definitely South Carolina.  Do you need the number?

10         Q.    Yes, sir.

11         A.    Can you see it --

12         Q.    Sure.

13         A.    -- because I won't be able to.

14               MR. KLAASMEYER:  I could also read it,

15    if need be.

16               MR. HAYES:    ███████████

17               THE WITNESS:  Okay.

18    BY MR. HAYES:

19         Q.    Thank you, sir.

20         A.    You're welcome.

21         Q.    Have you ever had a suspended driver's

22    license for any reason?

23         A.    Yes.

24         Q.    How many times?

25         A.    Once.

1          Q.     And what was that for?

2          A.     That was for the DUI in Ohio.

3          Q.     Okay.  Mr. Keller, do you have any

4    income other than your monthly disability payment?

5          A.     Personally, I mean, what my wife is

6    currently earning and then we -- when we sell like

7    a cow or something off our farm.

8          Q.     Okay.

9          A.     That's real sporadic right now.

10         Q.     And what is your wife currently

11   earning?

12         A.     I don't know the exact figure.

13         Q.     Okay.  Where is she working?

14         A.     She's not working.

15         Q.     Okay.  But you just said that she was

16   bringing in income --

17         A.     Yes.

18         Q.     -- but she's not working.  So where --

19         A.     Right.

20         Q.     Where is the income coming from?

21         A.     From her long-term disability.

22         Q.     Oh, okay.  And you don't know what that

23   monthly payment is?

24         A.     Not to the dollar, no.

25         Q.     Okay.  What -- do you know what it is

EXHIBIT 1

Page 42

1    approximately?

2            A.    I want to say approximately 5,500 or

3    something like that.

4            Q.    Per month?

5            A.    Yes, sir.

6            Q.    Okay.  And do you know if she is

7    applying for permanent disability?

8            A.    I don't know that she is.

9            Q.    Okay.  She may be?  She may not be?

10   You don't know?

11           A.    I don't know.  I want to -- I think

12   it's all being handled through MetLife.

13           Q.    Okay.  So as far as sources of income

14   for your family, we've got your monthly payment,

15   your wife's current monthly payment and then

16   whatever you bring in from livestock?

17           A.    Correct.

18           Q.    It's my understanding that -- your

19   wife told us a little bit about the company.  Y'all

20   actually have companies set up for your farm.  Is

21   that correct?

22           A.    Yes.

23           Q.    Are you a member of those companies?

24           A.    Yes.

25           Q.    How many companies are set up for your

EXHIBIT 1

Page 43

```
 1    farm?

 2           A.    Just one.

 3           Q.    Okay.  And what's the name of it again?

 4           A.    Lazy K Ranch Keller Farms.

 5           Q.    And that's an LLC?

 6           A.    That is correct.

 7           Q.    Do you know off the top of your head

 8    how much money Lazy K Ranch Keller Farms, LLC

 9    brought in?  Well, what -- how long has it been in

10    existence?

11           A.    For approximately two and a half, three

12    years.

13           Q.    Okay.  Do you know how much money it

14    brought in in 2024?

15           A.    It was roughly $1,600.  Maybe a little

16    more than that.

17           Q.    For the whole year?

18           A.    Yes.

19           Q.    Okay.

20           A.    It's -- we are still way in start-up

21    mode.

22           Q.    Got you.  What about in 2025?  How's it

23    doing this year?

24           A.    Well, there's been no sales at all thus

25    far.
```

EXHIBIT 1

Page 44

1        Q.   So it's brought in zero dollars

2   in 2025?

3        A.   Correct.

4        Q.   And I read somewhere that there's also

5   another related entity associated with the farm.

6   Is that maybe one that your son or --

7        A.   They have --

8        Q.   -- his wife --

9        A.   Yeah.  They have a business.  I'm

10  sorry.  I didn't mean to step on you there, but

11  they have a -- a business as well.

12       Q.   Okay.  And what's his name?

13       A.   My son's name?

14       Q.   The -- the -- your son's business'

15  name.

16       A.   I believe he goes by Keller Farms, LLC.

17       Q.   Okay.  So what's the -- what's the

18  purpose of Lazy K Ranch Keller Farms, LLC?

19       A.   Well, the goal is to raise grass-fed

20  angus beef, non-GMO, no growth hormones, things of

21  that nature, marketing that to the private sector

22  as well as raising organically raised pork and

23  doing the same.

24       Q.   Okay.  And your son's company, Keller

25  Farms, LLC, what's its purpose?

EXHIBIT 1

Page 45

```
1          A.    Right now they are goats and chickens.

2          Q.    Okay.  Do you know how Keller Farms,

3    LLC is doing, what kind of money it's bringing in?

4          A.    No, sir.

5          Q.    Who -- and it's my understanding from

6    your wife's deposition that both you and she are

7    the owners of Lazy K Keller Ranch -- Lazy K Ranch

8    Keller Farms, LLC?

9          A.    Yes, sir.

10         Q.    Are there any other owners?

11         A.    No, sir.

12         Q.    How many cows does Lazy K Ranch Keller

13   Farms, LLC have right now?

14         A.    Four.

15         Q.    How many pigs?

16         A.    One.

17         Q.    Any other animals?

18         A.    Ducks.  We have ducks.

19         Q.    Are they a valuable asset or are they

20   just around?

21         A.    Well, once they start having babies and

22   laying eggs they would be.  But right now they're

23   just around.

24         Q.    Okay.  So cows, pigs, ducks.  Any

25   other?
```

EXHIBIT 1

1          A.    And the goats and chickens that belong

2     to my -- my son.

3          Q.    How many goats are out there?

4          A.    I'm just guessing.  This is a

5     approximate number.  I believe there's like seven

6     or eight.

7          Q.    And chickens?

8          A.    Roughly about 45, 50.

9          Q.    Does Lazy K Ranch Keller Farms, LLC

10    have any employees beside you and your wife?

11         A.    Just she and I.

12         Q.    Keller Farms, LLC, does it have any

13    employees?

14         A.    Not to my knowledge.

15         Q.    So all of the livestock, care and

16    feeding and all of that stuff falls to you and your

17    wife?

18         A.    Me and my son and my daughter-in-law

19    help.

20         Q.    Okay.  So the four of y'all?

21         A.    My wife currently is not able to help

22    at all.

23         Q.    Okay.  She doesn't do anything with the

24    animals right now?

25         A.    She's not able to, no.

Page 47

```
 1          Q.   And how long has she been unable to
 2     assist with the animals?
 3          A.   Shortly after her -- the -- the
 4     accident that she -- that -- that we're talking
 5     about today she's just not been able to -- to do
 6     anything.
 7          Q.   So the accident that we're here to talk
 8     about happened in February of 2024.  Is that your
 9     recollection?
10          A.   Yes, sir.
11          Q.   So it's your testimony that she has not
12     helped with the animals since February of 2024?
13          A.   That's correct.
14          Q.   What was she doing with -- to help with
15     the animals before this incident?
16          A.   I mean, she would help with the
17     feeding, giving them -- giving them grain and some
18     sweet feed.  She would help clean out the stalls.
19     She'd even ride the -- the tractor.  You know,
20     cutting down the -- the pastures, taking the top
21     off of the pastures, raking it up.  Things like
22     that.
23          Q.   So she would help feed the animals?
24          A.   Yes.
25          Q.   Clean -- clean up after them?
```

Page 48

```
 1          A.   Yes, sir.

 2          Q.   Ride the tractor?

 3          A.   Yes, sir.

 4          Q.   What do y'all use the tractor for?

 5          A.   Oh.  Well, mowing.  Mowing, disking,

 6     sewing seed, putting up fencing.

 7          Q.   Is -- are there any crops out there?

 8          A.   We have a garden, yes.

 9          Q.   Okay.  Is that just for personal use or

10     are y'all trying to sell any of those fruits and

11     vegetables?

12          A.   Currently it's just personal.

13          Q.   Okay.  How many acres do y'all have?

14          A.   26 and a half.

15          Q.   And how many of it are wooded versus

16     cleared?

17          A.   We have approximately 13 acres that

18     are -- that are wooded and the remainder of it

19     is -- is clear.

20          Q.   So about half and half?

21          A.   Yes, sir.  Roughly.

22          Q.   And it's just the two --  how many

23     structures are out there on that property?  Your

24     house?  Your son's house?

25          A.   And we have a -- a -- a barn and an --
```

EXHIBIT 1

Page 49

```
 1    and an outbuilding.  A pump house and a pole barn.

 2              Q.   So a barn?

 3              A.   Yeah.  There's a one -- there's one

 4    legitimate barn, there's a pump house and what we

 5    call the pole barn which is --

 6              Q.   And what is that just out of curiosity?

 7              A.   The pole barn?

 8              Q.   Yes.

 9              A.   It's basically almost like a lien-to

10    structure that we -- we store like hay underneath

11    it, currently housing some additional fencing

12    materials.

13              Q.   Okay.

14              A.   That's basically it.

15              Q.   When was the barn built?

16              A.   I have no idea.

17              Q.   Okay.  Did you build -- did -- did you

18    construct any of these --

19              A.   No.

20              Q.   -- structures?

21              A.   No, sir.

22              Q.   So they were all there when you moved

23    in?

24              A.   Yes, sir.

25              Q.   How many cars do you own, Mr. Keller?
```

Page 50

```
 1          A.    One.

 2          Q.    And what is it?

 3          A.    A 2009 Lincoln MKZ.

 4          Q.    How many cars does Mrs. Keller own?

 5          A.    None.

 6          Q.    It's my understanding she previously

 7     had take-home cars from her prior job -- is that

 8     correct --

 9          A.    Correct.

10          Q.    -- but has not bought a replacement car

11     since then?

12          A.    No.

13          Q.    When did she separate from

14     Mercedes-Benz?

15          A.    I don't recall the exact date.

16          Q.    Okay.  Do you remember the month?

17          A.    Not the exact month.

18          Q.    Okay.  Do you remember about when it

19     was?

20          A.    I -- it was sometime.  I -- I believe

21     early this year.

22          Q.    Okay.  Why did she leave Mercedes-Benz?

23          A.    That -- she was just unable to -- to

24     work due to the pain.  She's --

25          Q.    Now, between this accident in February
```

EXHIBIT 1

Page 51

```
1    of 2024 and when she ultimately left Mercedes-Benz

2    she did go back to work for a while.  Correct?

3            A.   Yes, sir.

4            Q.   About how long was she back to work

5    before she left Mercedes-Benz?

6            A.   I -- it wasn't very -- I mean, I don't

7    know the exact time, the length.  I know that she

8    did make an effort to return back to work and I

9    wish I could tell you the, you know, timeline, but

10   I -- I don't recall exactly.

11           Q.   Okay.  Did she voluntarily leave

12   Mercedes-Benz or was she fired?

13           A.   It was volunteer.

14           Q.   She voluntarily left?

15           A.   Yes.

16           Q.   So as far as you know, they were

17   willing to accommodate her if she wanted to stay or

18   was able to stay.  Correct?

19           A.   No.  I don't know that for sure.

20           Q.   Okay.  Has she sought any other

21   employment since leaving Mercedes-Benz?

22           A.   No.

23           Q.   Mr. Keller, are you a member of any

24   churches?

25           A.   No.
```

EXHIBIT 1

```
                                              Page 52
 1          Q.    Are you a member of any other religious
 2    organizations?
 3          A.    No.
 4          Q.    What about clubs?  Bowling leagues?
 5          A.    No.
 6          Q.    Social groups?
 7          A.    No.
 8          Q.    Do you have any social media?
 9          A.    Yes.
10          Q.    What do you have?
11          A.    Facebook.
12          Q.    What's your name on Facebook?
13          A.    I guess it's my name, Jack Keller.
14          Q.    Okay.  Is it public or private?
15          A.    It's a private.
16          Q.    Have you made any posts on social media
17    about this incident or your wife's medical
18    treatment or condition?
19          A.    No.
20          Q.    Does the ranch have a -- any type of
21    social media?
22          A.    No.
23          Q.    How do y'all market the ranch?
24          A.    We are -- I mean, right now it's just
25    word of mouth.
```

EXHIBIT 1

Page 53

1          Q.   Okay.  So it's your testimony that --
2     and your -- as far as personal social media you
3     just have Facebook.  Correct?
4          A.   And Instagram.
5          Q.   And Instagram?
6          A.   Yeah.  I believe I have an X account as
7     well.
8          Q.   What's your name on Instagram?
9          A.   I think it's the same.
10         Q.   And what about X?
11         A.   I don't know.  I could look and tell
12    you but my phone is down in the car.  I don't know
13    what it is off the top of my head.
14         Q.   And then your -- your business doesn't
15    have any social media presence?
16         A.   Not presently, no.
17         Q.   Okay.  All right, Mr. Keller.  We've
18    been going about an hour.  I should have mentioned
19    this at the beginning.  We are going to try to take
20    a break at the end of every hour.
21         A.   I appreciate that.
22              MR. HAYES:  So let's go off the record
23    for a few minutes for a restroom break.
24              THE VIDEOGRAPHER:  Off the record at
25    11 o'clock.

EXHIBIT 1

Page 54

```
 1                    (A recess transpired.)

 2                    THE VIDEOGRAPHER:  On the record at

 3       11:08.

 4       BY MR. HAYES:

 5           Q.    Okay.  Mr. Keller, just a -- a few more

 6       questions on some of -- some of this topic.  Are

 7       y'all married filing jointly or married filing

 8       separately?  Do you know?

 9           A.    Joint.

10           Q.    Do y'all have joint bank accounts or

11       separate bank accounts?

12           A.    Joint.

13           Q.    Who does your taxes?  Do you know?

14           A.    My daughter, Chassidy Lyles.

15           Q.    Okay.  On like TurboTax --

16           A.    Yes, sir.

17           Q.    -- or something like that?

18           A.    (Nods head.)

19           Q.    How many -- has she always done your

20       taxes?

21           A.    No.

22           Q.    How long has she done your taxes?

23           A.    Three -- approximately three years.

24           Q.    Okay.  What financial institutions do

25       you have bank accounts with?
```

EXHIBIT 1

Page 55

```
 1          A.   Wells Fargo and Bank of America.

 2          Q.   Do you have any hobbies, Mr. Keller?

 3          A.   Yes.

 4          Q.   What are your hobbies?

 5          A.   Music, shooting.

 6          Q.   Music as in playing or listening or

 7   both?

 8          A.   Both.

 9          Q.   Okay.  What do you play?

10          A.   Drums or did anyway.

11          Q.   You don't play anymore?

12          A.   Not very often.

13          Q.   Any other instruments?

14          A.   No.

15          Q.   Are you in a band?

16          A.   No longer.

17          Q.   What was -- when did you leave the --

18   the band?

19          A.   Oh, God.  I was a young man.

20          Q.   Oh, okay.

21          A.   A very young man.

22          Q.   Okay.  A long --

23          A.   So far --

24          Q.   -- time ago?

25          A.   -- back that mullets were in style.
```

EXHIBIT 1

Page 56

```
 1          Q.   So you haven't been in a band
 2    recently?
 3          A.   No.  No.  No.
 4          Q.   And then shooting.  I believe Mrs.
 5    Keller told us y'all have a shooting range out --
 6          A.   Yes.
 7          Q.   -- on the property?  Rifles?  Pistols?
 8    Shotguns?  All of the above?
 9          A.   All of the above.
10          Q.   How often do y'all shoot?
11          A.   I mean, it's not on a consistent
12    ongoing basis, but maybe once a month.  Sometimes
13    more.  Sometimes a lot less.
14          Q.   Do y'all do competitions?
15          A.   No, sir.
16          Q.   Do you have a drumset set up in your
17    house?
18          A.   No.  I have drums, but they're not set
19    up.
20          Q.   Got you.  Okay.  So playing the drums
21    occasionally, shooting once a month.  Do you have
22    any other hobbies?
23          A.   No, sir.
24          Q.   Mrs. Keller told us that y'all go out
25    to eat at a Mexican restaurant on -- on Friday
```

EXHIBIT 1

Page 57

1    nights.

2           A.   Yes.

3           Q.   Do y'all still do that?

4           A.   Yes.

5           Q.   Do y'all have any other restaurants you

6    regularly go to besides the Mexican restaurant?

7           A.   Not on a regular basis, no, sir.

8           Q.   How many nights a week do y'all eat out

9    would you say?

10          A.   One.

11          Q.   On Friday night?

12          A.   Usually.  I mean, there -- it may hit

13   or miss throughout the week.  It really depends on

14   everybody's pain level.

15          Q.   Okay.  And the restaurant, I believe,

16   is Armando's --

17          A.   Armando's.

18          Q.   -- in --

19          A.   St. George.

20          Q.   St. George?

21          A.   That's correct.

22          Q.   And y'all are in Bowman.  Right?

23          A.   That's correct.

24          Q.   So what are -- and is St. George one of

25   the nearer things to y'all or is that --

Page 58

1          A.    The only nearer thing.

2          Q.    Yeah, or until you come down this way

3     to North Charleston/Ladson/Summerville area --

4          A.    Or go to Orangeburg.

5          Q.    -- or go to Orangeburg?

6          A.    Yes.

7          Q.    Okay.  And I believe Mrs. Keller told

8     us that y'all have a timeshare in Florida?

9          A.    That's correct.

10          Q.    Do you have any other -- does -- does

11    that give you access to anywhere besides the --

12    the place in Florida?

13          A.    Yes.

14          Q.    So is that through Disney?

15          A.    Through the Marriott Vacation Club.

16          Q.    Oh.  Marriott Vacation Club?

17          A.    Yes.

18          Q.    Got you.  So what all places are you

19    entitled to go with that timeshare?

20          A.    Anywhere that Marriott has resorts.

21          Q.    The way I understand that that works is

22    the actual piece of the real estate that you own is

23    that -- is it a condo in Florida?

24          A.    The resort, yes.

25          Q.    Okay.  So your ownership is tied to

Page 59

1   that physical condo in Florida, but you can go to

2   their other properties around the world?  Is that

3   how that works?

4        A.   No.  The ownership is -- is with any of

5   the Marriott Vacation Club resorts anywhere in the

6   world.

7        Q.   Okay.

8        A.   It's based on a points system, how many

9   ownership points do you have, which would allow you

10  to get -- go anywhere for that length of time that

11  your points allow you to be.

12       Q.   Okay.  Do y'all go to the same condo in

13  Florida every time?

14       A.   Thus far, yes.

15       Q.   Have you been anywhere else on the

16  Marriott Vacation Club?

17       A.   No.

18       Q.   How many times per year do y'all go

19  down to the -- the Florida condo?

20       A.   Once.

21       Q.   How many times per year are y'all

22  entitled to go with your level of membership?

23       A.   Depends on the length of stay each

24  time.

25       Q.   Okay.

EXHIBIT 1

```
                                              Page 60
 1          A.   So if we were -- you know, for example,

 2     a seven-day is so many points.  If there's anything

 3     left over then we could -- we could either use them

 4     for like a -- a two or three-day somewhere,

 5     wherever that may be, or roll them over into the

 6     following season because it is definitely use it

 7     or lose it.

 8          Q.   Okay.  So have you used all of your

 9     days this year?

10          A.   No.

11          Q.   How many days do you have left?

12          A.   I don't know to be exact.

13          Q.   Okay.

14          A.   I'm not very good at managing that.

15          Q.   Okay.  Does she manage that?

16          A.   No.

17          Q.   Does anybody manage that?

18          A.   I try to.

19          Q.   Okay.  How much does it cost you per

20     year to be in the Marriott Vacation Club?

21          A.   It -- again, it -- it's about point

22     volume once you purchase.  We are currently at --

23     I should know this off the top of my head.  It's

24     like $600 a month right now until it's paid for --

25          Q.   Okay.
```

Page 61

```
 1          A.   -- based on the point volume that we

 2     bought.  So...

 3          Q.   How -- how long have y'all been

 4     enrolled in the Marriott Vacation Club?

 5          A.   That would be since 2015, 2016, 2018.

 6     Somewhere in that area.  I -- I don't know the

 7     exact date.

 8          Q.   Did you use all of your -- have you

 9     ever had a year where you didn't use all of your

10     days?

11          A.   Oh, yes.

12          Q.   Did you use all of your days in 2023?

13          A.   I don't know.

14          Q.   What about '24?

15          A.   I don't believe we used them all.

16          Q.   And you still have days left in 2025?

17          A.   Yes.

18          Q.   In this calendar year -- 2025 -- what

19     trips have you and Mrs. Keller taken?

20          A.   Define trips.  Vacations?

21          Q.   Somewhere where you stayed other than

22     your house for a night.

23          A.   Oh, I see.

24          Q.   At least a night.

25          A.   Well, we obviously -- we went to West
```

EXHIBIT 1

Page 62

```
 1   Palm Beach for Fourth of July.  We were there.
 2         Q.   And how many nights?
 3         A.   That was from -- that was a seven --
 4   seven-day, seven night.  Sunday to Sunday.
 5         Q.   Okay.
 6         A.   Let's see.  First -- the end of June
 7   first -- you do the first week of July.  It's kind
 8   of traditional.  We went over to our daughter's
 9   house.  Our youngest daughter's house.
10              I want to say that was, I think, two
11   different trips.  Once was for a baby shower and
12   I'm trying to remember if we actually stayed.  I
13   believe we did.  And then we went over for a visit
14   and we spent the night there and then --
15         Q.   Was that -- whose -- whose house is
16   that?
17         A.   That would be my youngest daughter's
18   house.
19         Q.   And what's her name?
20         A.   Andrea.
21         Q.   And where does she live?
22         A.   Dawsonville, Georgia.
23         Q.   And how many nights do you usually
24   spend at her house when you go?
25         A.   Well, we -- I mean, when we go it's
```

Page 63

1   usually like a long weekend.  It would be two --

2   two or three nights, but then we come -- come

3   back because of the length of the trip.  It's

4   pretty exhausting.

5        Q.   Okay.

6        A.   And then we went up for obviously my

7   granddaughter's wedding up to Greenville.  We went

8   up for that that evening, spent the night and came

9   back.

10        Q.   Where did you stay?

11        A.   A Marriott hotel.  I believe it was

12   a -- no.  This was a Hilton actually because they

13   had the Hilton there.

14        Q.   Okay.  Where else?

15        A.   Other than trips to and from doctors

16   we -- you know, obviously we don't spend the night

17   there.  I don't believe anywhere else.  That's

18   pretty much all I can recall right there.

19        Q.   Okay.  In 2024 did y'all do the West

20   Palm trip for July 4th?

21        A.   Yes.

22        Q.   Also seven nights?

23        A.   Approximately, yes.

24        Q.   Do you remember any other trips in 2024

25   overnight, at least one night?

Page 64

1          A.    I mean, I'm sure we went over to my

2    daughter's house in Georgia.  I don't know the

3    exact dates.  I'm trying to think of anywhere else

4    we might have gone to stay the evening.  I don't

5    recall any others.

6          Q.    Okay.  Sorry for the page flipping.

7    I did have a follow-up question based on your

8    employment that you were telling me about earlier.

9          A.    Uh-huh.

10         Q.    I think you told me that after your

11   second tenure at Guardian you went to a Texaco gas

12   station.

13         A.    Yes.

14         Q.    How did you find out about the position

15   at the Texaco gas station?

16         A.    That was basically going door to door

17   with all the other -- with the businesses that were

18   in Crystal River just trying to land a job, filling

19   out applications.  That's it.

20         Q.    Okay.  So how did you wind up from

21   Kentucky to Florida?

22         A.    When -- when Guardian did their

23   downsize there it was like, okay, where are we

24   going to go?  So my parents lived in Crystal River,

25   Florida.  We needed a place to go.

EXHIBIT 1

Page 65

```
 1          Q.    Okay.

 2          A.    That's how.

 3          Q.    And that actually brings up my second

 4   line of questioning about who has lived with you

 5   where.  So who was living with you or I guess where

 6   along the way were you living with Christine?

 7          A.    Where along the way?

 8          Q.    Yeah.  Where all did y'all live?

 9          A.    We lived in Ohio and in Easley, South

10   Carolina.

11          Q.    Okay.  And then y'all split in Easley.

12   Is that correct?

13          A.    Correct.

14          Q.    And your -- your biological son -- and

15   I know -- and apologize for the use of the terms

16   that you don't use to refer to your children.

17          A.    It's all good.

18          Q.    I just have to have some distinguishing

19   term.  So your -- your son -- and what is his name?

20   Your biological son.

21          A.    I don't have a biological son.

22          Q.    Okay.

23          A.    I have adopted sons.

24          Q.    Excuse me.  Your daughter.

25          A.    Chassidy.
```

EXHIBIT 1

1     Q.   Yes.  Where was she living with you?

2     A.   In Ohio and in Easley, South Carolina.

3     Q.   Okay.  And then she, I guess, graduated

4  and moved out of the house in Easley or she went

5  with Christine for a time?  How did that work?

6     A.   She -- she stayed with her mother when

7  her mother and I split up.

8     Q.   Okay.  And then when you got together

9  with Irene were any of her children minors that

10  moved in with you?

11     A.   Yes.

12     Q.   Okay.  Were all three of them minors at

13  the time y'all got together?

14     A.   There was just two.

15     Q.   Two?

16     A.   Yes.

17     Q.   Okay.  And I guess I'm confused because

18  you keep saying four.

19     A.   Uh-huh.

20     Q.   So who's the -- so Irene has two --

21     A.   Yes.

22     Q.   -- and you have one.  Who is the

23  fourth?

24     A.   My oldest son --

25     Q.   Okay.

EXHIBIT 1

Page 67

```
 1          A.    -- which is my ex-wife's biological
 2    son.  My adopted son.
 3          Q.    Okay.  So you adopted him.  Got you.
 4          A.    Yes.
 5          Q.    So both of Irene's children were minors
 6    when y'all got together?
 7          A.    Yes.
 8          Q.    And where was the first place y'all all
 9    lived together as a family?
10          A.    That would have been LaGrange, Georgia
11    because the -- one of the children were unborn at
12    the time.
13          Q.    Okay.  So how many children did Irene
14    have when y'all got married?
15          A.    Two.
16          Q.    Okay.  And the first place y'all lived
17    was in LaGrange, Georgia?
18          A.    That's correct.
19          Q.    And that was when you were with
20    Guardian Automotive?
21          A.    Yes.
22          Q.    And I actually don't think I asked you
23    this, but your oldest son's name?
24          A.    Travis.
25          Q.    And how old is he?
```

Page 68

```
 1          A.    He's 42, I think.  Forty-one.

 2          Q.    And where does he live?

 3          A.    He lives in Simpsonville, South

 4    Carolina.

 5          Q.    And Chassidy's your next?

 6          A.    Yes.

 7          Q.    And how old is she?

 8          A.    She is 38.

 9          Q.    And then your next?

10          A.    Would be Christian.

11          Q.    Christian.  How old is he?

12          A.    He is 28, 29.

13          Q.    And where does he live?

14          A.    He lives in Bowman, South Carolina.

15          Q.    Oh, that's right.  He lives on the

16    property with you?

17          A.    Yeah.

18          Q.    And what's his wife's name?

19          A.    Kendall.

20          Q.    K-E-N-D-A -- D-A-L-L?

21          A.    Yes.

22          Q.    And do they have any children?

23          A.    No.

24          Q.    And your youngest child?

25          A.    Andrea.
```

Page 69

```
 1        Q.    And she's in Georgia?

 2        A.    Correct.

 3        Q.    And is she married?

 4        A.    Yes.

 5        Q.    And what's her husband's name?

 6        A.    Gary.

 7        Q.    And do they have children?

 8        A.    One expected.

 9        Q.    Oh, okay.  Congratulations.

10        A.    Thank you.

11        Q.    So how many grandchildren will that be?

12        A.    Total, four.

13        Q.    Okay.  So you've got three current,

14  soon to be four?

15        A.    Correct.

16        Q.    Do you remember Mrs. Keller being in a

17  wreck in 2022?

18        A.    Yes.

19        Q.    Tell me what you remember about that.

20        A.    Basically she had called me and --

21  and told me that she was involved in a -- a

22  rear-end collision while she was on her way to

23  work.

24        Q.    And she was hit from behind.  Correct?

25        A.    Yes.
```

EXHIBIT 1

Page 70

1          Q.    Did you go out there to the scene of

2    it?

3          A.    No.  I did not.

4          Q.    Did she call you while she was still on

5    the side of the road?

6          A.    Yes.

7          Q.    Do you remember about where that took

8    place?  About where on the road that took place or

9    what road that took place on.

10          A.    I -- I believe it was on Lincolnville

11    Road.

12          Q.    And what city is that?

13          A.    That would have been Summerville/Ladson

14    area.

15          Q.    Tell me what else you remember about

16    that day after she called you.

17          A.    I remember that she -- I mean, she

18    was -- she was hurt, but it wasn't bad.  I believe

19    she did go to the emergency room.

20          Q.    Do you remember if she went to the

21    emergency room by ambulance or by private vehicle?

22          A.    I believe it was by private vehicle.

23          Q.    Did she drive herself or did someone

24    take her?

25          A.    I believe someone took her, but I can't

Page 71

1  recall.  She didn't have a car.  Her car was

2  destroyed.

3         Q.   Did you meet her at the ER?

4         A.   No.

5         Q.   Do you know who it was that took her to

6  the ER?

7         A.   No.

8         Q.   Where were you when she called and told

9  you that she'd been in that --

10        A.   I was at home.

11        Q.   Okay.  Any particular reason you were

12 not able to go up to the ER?

13        A.   There was no reason.  I mean, she --

14 I'm just -- I'm trying to recall.  She said that,

15 you know, she was okay and -- because I did ask her

16 if she needed me to come up there and she said no.

17        Q.   Okay.

18        A.   Something to that effect.

19        Q.   Was she treated and released the same

20 day or was she admitted to the hospital?

21        A.   I believe it was the same day.

22        Q.   And how would you describe her health

23 condition before that 2022 wreck?

24        A.   Good.

25        Q.   Any problems?

Page 72

```
 1          A.    None.

 2          Q.    Tell me what you observed about her as

 3    far as health conditions after that 2022 wreck.

 4          A.    She was definitely in pain.  She was

 5    going through physical therapy, but she was still

 6    what I will call functional.

 7          Q.    What areas of her body did she report

 8    to you were bothering her or hurting her as a

 9    result of the 2022 wreck?

10          A.    Well, like her -- her back, her foot,

11    her hands.

12          Q.    What parts of her back did she report

13    to you were bothering her after the 2022 wreck?

14          A.    She didn't tell me anything specific.

15    Just back.

16          Q.    And when you say she was still

17    functional after the 2022 wreck --

18          A.    Yes, sir.

19          Q.    -- what do you mean by that?

20          A.    I mean, she was still able to, you

21    know, stand, walk, sit for long periods of -- well,

22    I won't say long periods of time.  But she was able

23    to do that.  She was able to work.

24                She was able to drive.  She was still

25    able to, you know, enjoy the things the around
```

Page 73

1    the -- our -- our house that she -- she enjoyed

2    doing.  You know, gardening, mowing the lawn.

3    Things like that.

4         Q.   Helping out with the animals?

5         A.   Oh, yes.

6         Q.   Did you go with her to any of her

7    medical appointments after the 2022 wreck?

8         A.   I believe I went -- I'm going to say

9    yes, but I won't be a hundred percent certain on

10   that.

11        Q.   Okay.  Do you remember which

12   provider -- we call them providers -- be it

13   physical therapists, orthopedists, et cetera.

14   Do you remember which providers you went to?

15        A.   I believe it was Southeastern --

16   Southeastern Spine --

17        Q.   Okay.

18        A.   -- and then Lowcountry Ortho.

19        Q.   Did she drive herself to her

20   appointments after the 2022 wreck?

21        A.   Most of the time, yes.

22        Q.   Does she drive now?

23        A.   No.

24        Q.   When was the last time you saw her

25   drive a car?

EXHIBIT 1

Page 74

```
1              A.   The physical date has been a while.
2    I don't recall the exact date.  It's been a bit.
3              Q.   Would that be when she had to turn in
4    her company car when she separated from Mercedes?
5              A.   Actually, they came and picked that car
6    up.
7              Q.   Okay.  Do you remember when they came
8    and picked her car up?
9              A.   I don't recall the exact date.
10   Early -- early in 2025.  Early.  Yeah.
11             Q.   Okay.  So you don't remember the last
12   time you saw her drive a car?
13             A.   Just speculation, it would be the last
14   time she went to work because when she was at home
15   I did all the driving because it was so painful for
16   her to do that.  Just -- I just --
17             Q.   Okay.  How would you describe her
18   recovery from the 2022 wreck?
19             A.   Could you expand on that.
20             Q.   Yes.
21             A.   Clarify that.
22             Q.   So after the 2022 wreck but before
23   this one in February of 2024 where was she in your
24   opinion and observation as far as recovering from
25   the injuries that she sustained in the 2022 wreck?
```

EXHIBIT 1

Page 75

1          A.    She was -- she was -- she was

2    recovering obviously.  She wasn't fully healed,

3    but she was definitely what I will call high

4    functioning or higher functioning.  She still had

5    pain obviously, but she was still able to do all

6    those things that you were just asking me about.

7    Driving and things of that nature.  You know,

8    helping out around the house.

9          Q.    Are you aware that she has recently

10   filed a lawsuit for that 2022 wreck?

11         A.    Just became aware of that --

12         Q.    Okay.

13         A.    -- and I believe it was the --  the

14   attorney filed that.

15         Q.    Okay.  But filed it in her name?

16         A.    Unbeknownst to us or to her.

17         Q.    Okay.  Do you know who that attorney

18   is?

19         A.    Scott Palmer, I believe, is his last

20   name.

21         Q.    Okay.  Do you know him?

22         A.    No.

23         Q.    Have you ever met him?

24         A.    Once.

25         Q.    So is it your -- is it your testimony

Page 76

 1    that he filed a lawsuit unbeknownst to you and

 2    Mrs. Keller?

 3         A.   Yes.

 4         Q.   Okay.  Are you also aware of a second

 5    lawsuit filed by Mrs. Keller against Liberty Mutual

 6    Insurance Company?

 7         A.   No.

 8         Q.   Have you seen the lawsuit filed on your

 9    wife's behalf by Scott Palmer?

10         A.   No.

11         Q.   When did you become aware of the

12    lawsuit?

13         A.   Last week.

14         Q.   Okay.  And how did you become aware of

15    it?

16         A.   Their -- they had sent her an e-mail

17    requesting that she sign some type of document,

18    some type of release document.  And we didn't know

19    anything about it.  So she reached out to them.

20    And they explained to her what it entailed and

21    we had chose not to sign that.

22         Q.   Okay.  So this was a document sent from

23    Scott Palmer's office --

24         A.   Correct.

25         Q.   -- to her?

EXHIBIT 1

Page 77

```
 1          A.    Yes.

 2          Q.    Okay.  And you found out about this

 3    last week?

 4          A.    Yes.

 5          Q.    What else do you know about the -- the

 6    lawsuit filed by Scott Palmer on your wife's

 7    behalf?

 8          A.    I don't.  I don't know anything about

 9    it.

10          Q.    Do you know what is being -- do you

11    know if your wife is claiming permanent injury in

12    that lawsuit --

13          A.    I don't --

14          Q.    -- filed by Scott Palmer?

15          A.    I don't know that.

16          Q.    She may be?  She may not be?  You just

17    don't know?

18          A.    I'm not aware.  No.

19          Q.    Okay.  And you're not aware of any

20    lawsuit filed on her behalf against Liberty Mutual

21    Insurance Company?

22          A.    No.  As I said, we -- we were not aware

23    of any of this -- of this activity until last week.

24          Q.    Did you help your wife find Scott

25    Palmer --
```

EXHIBIT 1

Page 78

1          A.    No.

2          Q.    -- for -- as -- as her attorney?

3          A.    No.

4          Q.    Do you know if your wife has filed a

5    workers' compensation claim with Mercedes-Benz as a

6    result of the 2022 wreck?

7          A.    I don't believe she did, but I -- I

8    won't -- I don't know if she did or did not.

9          Q.    She did file a workers' compensation

10   claim as a result of the 2024 wreck that brings us

11   here today.  Correct?

12         A.    I don't know that either.

13         Q.    Do you know of any workers'

14   compensation claims that your wife has filed

15   against Mercedes-Benz?

16         A.    No.  I don't believe there's any --

17         Q.    Okay.

18         A.    -- but I don't know for sure.  You're

19   okay.

20         Q.    Have you -- have you known your wife to

21   be involved in any other legal actions besides the

22   lawsuit for the 2022 wreck and the lawsuit for the

23   2024 wreck?

24         A.    Other than the divorces (inaudible).

25               THE COURT REPORTER:  I'm sorry.  I

Page 79

 1    didn't hear you.

 2              THE WITNESS:  Oh.  I mean, she's

 3    obviously been divorced.

 4    BY MR. HAYES:

 5         Q.   That's right, and I should have

 6    specified.

 7         A.   Yeah.

 8         Q.   Any injury actions?

 9         A.   To my knowledge, no.

10         Q.   So just the one from the 2022 wreck and

11    just the one from the 2024 wreck?

12         A.   As far as I know, yes.

13         Q.   And you don't know if she's ever filed

14    a workers' compensation claim against anyone.

15    Correct?

16         A.   I won't say anyone.  I don't know.

17         Q.   Okay.  How long was she with

18    Mercedes-Benz?

19         A.   Approximately 19 years.

20         Q.   How did you find out about this

21    collision in February of 2024?

22         A.   She called me on the phone and told me

23    about it.

24         Q.   Okay.  Where were you when she called

25    you?

EXHIBIT 1

Page 80

```
 1          A.    At home.

 2          Q.    What did she tell you?

 3          A.    That she had been involved in a -- a

 4   collision, that a semi-tractor trailer had collided

 5   into her and ran her off the road.

 6          Q.    Did she use the phrase it had run her

 7   off the road?

 8          A.    I can't recall the exact phrasing that

 9   she used.  She just told me that it involved a

10   semi-tractor trailer.

11          Q.    Okay.  Did she call you from the scene

12   or had she already moved on?

13          A.    Oh, no.  She called me from the scene.

14          Q.    What else did she tell you while she

15   was sitting at the scene?

16          A.    Well, I asked her if she was okay and,

17   you know, she said that she was, you know, alive.

18   And I asked her if she needed an ambulance and she

19   was waiting for the -- the state trooper to show up

20   and I think my -- our youngest son who she was on

21   the phone with at the time of the accident through

22   the Bluetooth -- they were talking.

23                He was coming home from work as she's

24   going into work.  So he actually went there because

25   I -- I -- I told her that I would be there shortly
```

EXHIBIT 1

Page 81

1    and she said he was on his way.

2         Q.    And that's --

3         A.    Christian Hunter.

4         Q.    -- Christian?

5         A.    (Nods head.)

6         Q.    Did y'all send any text messages back

7    and forth while she was waiting on the officer to

8    get there?

9         A.    I don't believe so.  I don't really

10   know if we texted at all about that.

11        Q.    Okay.  Do you have the same phone that

12   you had back then?

13        A.    Yes.  Well, not the exact same model.

14   No.

15        Q.    Okay.

16        A.    The same phone number.

17        Q.    Is it an iPhone?

18        A.    No.

19        Q.    What type of phone do you have?

20        A.    I have an android.

21        Q.    Is it the kind of phone that saves your

22   text message thread even if you get a new phone?

23        A.    I have to assume, yes.  I mean, that's

24   not my forte, you know.

25        Q.    Do you think you still have your text

EXHIBIT 1

Page 82

1    message exchanges with your wife back from February

2    of 2024?

3         A.   I don't know if I do or not.  If I --

4    if I do, they're there, yes.  But I don't know if

5    they're -- for a fact.

6         Q.   Well, if you will, do me a favor.

7    Please don't actively delete any of those text

8    messages --

9         A.   That's fine.

10        Q.   -- from February of 2024.

11        A.   That's fine.

12        Q.   What kind of phone does your wife have?

13        A.   Well, currently she has an android.

14        Q.   Well, did she have something different

15   previously?

16        A.   She had a work phone that she used

17   quite extensively and that was an iPhone.

18        Q.   So now she has an android?

19        A.   Yeah.  It's her personal phone.

20        Q.   Does she have any type of smartwatch?

21        A.   No.

22        Q.   Does she have any type of Fitbit or any

23   other wearable fitness tracking technology?

24        A.   No.

25        Q.   What about those rings that everybody's

EXHIBIT 1

Page 83

```
 1   wearing now?  I think they call them Oura rings.
 2          A.   No.
 3          Q.   So to your knowledge, no wearable
 4   health or fitness trackers?
 5          A.   Not to my knowledge, no.
 6          Q.   Did you go with her or did -- did you
 7   meet her anywhere?  Did she go to the hospital on
 8   the day of this incident?
 9          A.   Yes.
10          Q.   Did you meet her at the hospital?
11          A.   I don't believe I did.
12          Q.   Okay.  Was she treated and released or
13   was she admitted?
14          A.   She was treated and released.
15          Q.   Any reason you were not able to meet
16   her at the hospital?
17          A.   She had gone -- against my advice,
18   she had gone into work to make sure that -- they
19   had something going on and she wanted to make sure
20   that her employees -- things were running well in
21   her department and then she -- from there it's my
22   understanding she went to the -- the hospital.
23          Q.   Okay.  So was there any reason that you
24   were unable to meet her at the hospital?
25          A.   No reason.  It's just she seemed --
```

EXHIBIT 1

Page 84

1    just going back recalling, she told me that -- that

2    it wasn't necessary for me to -- to make that trip.

3              Q.    Do you remember how long she was in the

4    ER that day?

5              A.    No, sir.  I do not.  Sorry.  Sitting

6    for a long time beats me up.

7              Q.    And if you need to take a five-minute

8    break, that's totally fine.

9              A.    I appreciate that.  I'm good for right

10   now.

11             Q.    All right.  Well, just wave your hand

12   at me if you do.  Okay?

13             A.    Good enough.

14             Q.    So tell me what you noticed about her

15   when she got home that night.

16             A.    I -- I wouldn't say it was night.

17   I don't know exactly the time that she came home,

18   but she was definitely in pain walking with

19   noticeable limps.  Stiff, very stiff movement.

20             Q.    And what areas of her body did she

21   report to you were hurting?

22             A.    Her neck, her shoulders, her -- her

23   back, lower back, her hands and her legs.

24             Q.    Do you know what the next medical

25   provider she saw after this 2024 wreck was?

Page 85

1          A.   I would -- I would think it was

2    some -- it was one of her doctors at -- at

3    Lowcountry Orthopaedic --

4          Q.   Okay.

5          A.   -- I believe.

6          Q.   And she was already an established

7    patient with them from the earlier wreck.  Correct?

8          A.   I believe, yes.  I -- I'm not sure a

9    hundred percent if she was still a patient.

10         Q.   Okay.  But she had been seeing them

11   after the 2022 wreck.  Correct?

12         A.   I think, yes.

13         Q.   Do you go with her to any of her

14   medical visits since this incident in 2024?

15         A.   Well, I've become her chauffeur.  So,

16   yes.

17         Q.   Okay.

18         A.   Either myself or -- or like my

19   daughter -- my daughter-in-law will take her

20   because she's not -- not able to drive safely.

21         Q.   Do you go into the room with her for

22   her visits --

23         A.   Yes.

24         Q.   -- or do you sit in the waiting room?

25         A.   No.  I go with her.

Page 86

1          Q.    So tell me the -- the places that you
2     have gone with her to.
3          A.    Primarily it's been to the Lowcountry
4     Orthopaedic Center.
5          Q.    Okay.  Anywhere else?
6          A.    The surgical center.  I was with her
7     there and all of her -- well, I won't say all
8     because, again, my daughter-in-law might -- might
9     have taken her to one or two trips to her physical
10    therapist.  Now, at her PT I do sit out in the --
11    in the vehicle and read.
12         Q.    Yeah.
13         A.    I don't go in to -- to there.
14         Q.    And when you said surgical center,
15    do you mean earlier this year when she had back
16    surgery?
17         A.    Yes, sir.
18         Q.    And it's my understanding that was an
19    outpatient surgery?
20         A.    I believe so, yes.
21         Q.    So she didn't spend the night there?
22         A.    No, sir.  No, sir.
23         Q.    So you took her there and brought her
24    home?
25         A.    Yes, sir.

EXHIBIT 1

1          Q.    What was the last medical appointment

2    that she had?

3          A.    We had just -- just had one.  She had

4    a follow-up with Dr. -- Dr. Patel just this past

5    week.

6          Q.    Were you in the room when he came in

7    and talked to her?

8          A.    Yes.

9          Q.    What was he saying?

10         A.    They basically -- I mean, it's --

11   it's how are you feeling, what's still bothering

12   you, things of that nature and -- and it was a --

13   this -- this last visit was a consult, I guess,

14   to -- moving on to the next area of treatment,

15   which would have been her neck.

16               And then he referred her, I guess,

17   to a -- a referral to Dr. -- is it Battista or

18   Battista?  Her surgeon --

19         Q.    Okay.

20         A.    Talk about the discs that she hurt in

21   her neck.

22         Q.    So the last visit you took her to was a

23   visit with Dr. Patel -

24         A.    Uh-huh.

25         Q.    -- and he was referring her to Dr.

EXHIBIT 1

Page 88

1   Battista?

2        A.   Yes, sir.  Well, it was -- I mean,

3   that -- that was the end result.  It was a

4   conversation about pain and managing her pain

5   basically and then when that was over with then

6   we -- we talked about the next -- next level of

7   treatment for her.

8        Q.   Okay.  What is the next level of

9   treatment for her in your understanding?

10       A.   Well, it's my understanding that she

11   will see Dr. Battista.  They will decide whether or

12   not they're going to replace the disc in her neck,

13   what will be the results if she chooses not to do

14   that, inserting some type of stimulator.  The

15   good/bad of all those options.

16       Q.   Have you known -- have you been present

17   either on the phone or in person when her doctors

18   spoke to her attorneys?

19       A.   No.

20       Q.   Have you seen any correspondence

21   between her doctors and her attorneys?

22       A.   No.

23       Q.   All right.  We've been going about

24   another hour.  So you want to take a quick five-

25   minute break?

Page 89

1          A.    If that's okay with you --

2          Q.    Let's do it.

3          A.    -- then it's okay with me.

4          Q.    Let's do it.  Yeah.

5          A.    Appreciate it.

6                MR. HAYES:  Let's go off the record.

7                THE VIDEOGRAPHER:  Off the record at

8     11:56.

9                (A recess transpired.)

10               THE VIDEOGRAPHER:  On the record at

11    12:04.

12    BY MR. HAYES:

13         Q.    Mr. Keller, you have your phone with

14    you now.  And my question for you is, does your

15    text message thread go back to February -- with

16    your wife go back to February of 2024 when this

17    wreck happened?

18         A.    Let me -- let me check to be sure.

19    February 2024.  I'm still looking.  I want to say

20    yes because I'm -- I would scroll and it took me

21    all the way back into like 2021, 2019.  So I'm

22    still trying to get to the 2024.

23               Let's see.  So I am in the 2024.  I'm

24    just looking to see if there's any text messages

25    pertaining -- I have some -- it begins -- it looks

Page 90

1   like it's in July.  From May 18th through July

2   there's -- I don't have anything in the early part

3   of 2024.

4          Q.   So what's the -- do you have any

5   messages between you and your wife from February

6   of 2024?

7          A.   Negative.

8          Q.   None whatsoever?

9          A.   No, sir.  You're welcome to look if

10  you wish.

11         Q.   Do you have messages -- but you have

12  messages before February of 2024.  Correct.

13         A.   I have messages.  The thread that I

14  have, I mean, that's -- this phone is saved from

15  her.  The earliest date for 2024 would be March

16  7th.  Then it goes back -- jumps back into --

17  December 11th, 2023 is the last.

18         Q.   Okay.  So you don't have any messages

19  from January 2024 --

20         A.   No, sir.

21         Q.   -- or February 2024 from your wife on

22  your phone?

23         A.   None that I can see and you're welcome

24  to look if you wish.

25         Q.   And your text message thread with your

EXHIBIT 1

1   wife, is that between your android phone and her

2   android personal phone?

3        A.   I don't have a way of depicting between

4   the two.  A lot of times she would text me with her

5   work phone as well.  So, I mean, I don't know how

6   to tell if this is -- that text is from her android

7   or from an iPhone.  I'm not that savvy.

8        Q.   And it's your testimony that you have

9   not actively deleted any text messages between you

10  and Mrs. Keller?

11       A.   That's correct.

12       Q.   Okay.  So, again like I said at the

13  beginning, if you would just make sure to not do

14  that --

15       A.   Yes, sir.

16       Q.   -- because we'll be sending a request

17  for that.

18       A.   That's fine.  Yes, sir.  Do you --

19  do you need -- want me to leave this open?  Close

20  it?

21       Q.   That's the question that I have for you

22  on right now on that issue, but I may come back to

23  it.

24       A.   Okay.

25       Q.   And I'm sorry for the delay.  She takes

EXHIBIT 1

Page 92

```
 1    down everything we say, but I won't get that for a
 2    couple of weeks.  So I've got to take notes and --
 3         A.   That -- that's fine.  That's --
 4         Q.   I can't write as fast as I used to.
 5    Did you see the damage to her vehicle that occurred
 6    during the 2022 wreck?
 7         A.   Yes.
 8         Q.   You physically laid eyes on the
 9    vehicle?
10         A.   Yes.
11         Q.   And you said that that vehicle was
12    destroyed?
13         A.   Yes.
14         Q.   Did you physically see the damage to
15    her vehicle that occurred in the 2024 wreck?
16         A.   Yes.
17         Q.   Was she able to drive it home?
18         A.   Yes.
19         Q.   What damage did you notice on the --
20    after the 2024 wreck?
21         A.   There was damage to the rear, I guess,
22    wheel well and wheel itself.  It might have been
23    some -- some damage to the rear -- as -- the rear
24    bumper area.
25         Q.   The damage in 2022 was much worse.
```

EXHIBIT 1

Page 93

1    Correct?

2            A.    It was pretty extensive, yes.

3            Q.    Okay.  And she continued to drive --

4    the vehicle that was involved in this 2024

5    collision, she continued to drive it for some

6    time.  Correct?

7            A.    Well, yes.

8            Q.    Do you know how long she continued to

9    drive it?

10           A.    I don't have an exact time.  It would

11   all be dependent on mileage.

12           Q.    So she ultimately turned in that

13   vehicle.  Correct?

14           A.    Yes.

15           Q.    But it wasn't because of the damage to

16   the vehicle?  It was because she got a new car on a

17   periodic basis from Mercedes.  Correct?

18           A.    Correct.

19           Q.    In the medical visits that you have

20   attended, have you ever heard any doctor tell her

21   after this 2022 wreck -- excuse me -- 2024 wreck at

22   any point in time, whether right after it happened,

23   or just recently or -- or somewhere in the middle

24   that she cannot go back to work?

25           A.    I heard her doctor tell her that if

EXHIBIT 1

Page 94

1    she continued to do what she's doing with work

2    it's not going to help her get better, which is

3    what prompted her decision to walk away from her

4    career --

5         Q.    Okay.

6         A.    -- in an effort to get well.

7         Q.    But as far as you know, you've never

8    heard a doctor say you cannot work or you've never

9    seen a doctor's note saying do not work?

10        A.    I've never seen a doctor's note, no.

11        Q.    Okay.  So it's your understanding that

12   the doctors told her what exactly about work?

13        A.    That if she continued to do what she

14   was doing at work, if she continued to work, it

15   would not -- she would not get better.  It would

16   not lend to her getting well.

17        Q.    Do you know if she asked for a

18   different position or responsibilities at work?

19        A.    She did not ask for one, no.

20        Q.    Okay.  Do you know of any restrictions

21   that have been placed on her?  Because I believe

22   you said that you actually have a -- a lifting

23   restriction on you.

24        A.    Yes, sir.

25        Q.    Do you know of any restrictions that

Page 95

1   have been placed on her?

2        A.   I don't know of them exactly.  I --

3   I -- I'm not aware of the exact restrictions.  No.

4        Q.   Okay.  So you -- you don't know if she

5   had has any lifting restrictions or --

6        A.   I believe she does, yes, but I'm not --

7        Q.   Okay.

8        A.   -- sure what the limitations are.

9        Q.   Do you know the amount of medical

10  bills that she has incurred as a result of the 2024

11  wreck?

12       A.   No, sir.

13       Q.   Do you know the amount of medical bills

14  that she incurred as a result of the 2022 wreck?

15       A.   No, sir.

16       Q.   Did she receive any payments from any

17  source after the 2022 wreck?

18       A.   Yes.

19       Q.   And do you know the amount of that

20  payment -- the gross amount of that payment --

21  before attorney's fees.

22       A.   No.

23       Q.   Do you know the net amount of that

24  payment after attorney's fees and all that stuff?

25       A.   I believe it was like 5,500 too 6,000,

EXHIBIT 1

Page 96

1   something like that, understanding everything had

2   been paid out and this was what was left.

3          Q.   Did y'all have a joint discussion

4   between the two of you when you were considering

5   the settlement for the 2022 wreck?

6          A.   No.

7          Q.   So between the two of y'all, y'all

8   didn't work on that issue together?

9          A.   Well, I mean, you have to clarify what

10  you're -- did we talk about a settlement?  Is that

11  what you're asking me?

12         Q.   Yeah.

13         A.   We discussed that with her attorney

14  and was informed that whoever this person was -- I

15  can't even remember this person's name.  They had

16  basically X in the amount of -- way of insurance

17  and no other assets and this is it.  This is -- you

18  know, so that's it.

19         Q.   Okay.  Did you participate with her in

20  her decision to settle that lawsuit?

21         A.    I was present, but, I mean, when

22  you're -- the attorney says this is the best

23  you're -- that we're going to get, she has nothing

24  else, so, okay.  It's kind of, you know.

25         Q.   Are you participating in her decision-

Page 97

1    making in this lawsuit from the 2024 wreck?

2         A.    We --

3              MR. KLAASMEYER:  Objection.  One

4    second.  Objection.  I think this is bordering on

5    areas -- we're getting into the attorney-client

6    privileged information.

7              So to the extent you can answer that

8    question without revealing attorney-client

9    privileged communication --

10             MR. HAYES:  Well, hold on just a

11   second.  Are you representing Mr. Jack Keller?

12             MR. KLAASMEYER:  Yeah.  He -- he has a

13   claim for loss of consortium.  It has not been

14   filed, but he has a claim for loss of consortium

15   and we represent obviously Mrs. Keller as well.

16             MR. HAYES:  Well, I certainly

17   understand you represent Mrs. Keller.  Have you

18   signed a -- Mr. Keller, have you signed a

19   representation agreement with Morgan & Morgan?

20             MR. KLAASMEYER:  Hold on.  I still -- I

21   think that's attorney-client privileged information

22   as well.

23             MR. HAYES:  I -- I disagree.  I'm

24   asking if a retention agreement has been signed.

25   The existence of the signed retention agreement is

EXHIBIT 1

1    not privileged information.  I'm not asking what's

2    in it.  I'm just asking if it's been signed, if it

3    exists.

4            MR. KLAASMEYER:  Well, you are asking

5    what's in it because you're asking if it -- I mean,

6    you're identifying what it's in it and then asking

7    him to confirm whether it exists or not.

8            MR. HAYES:  Well, I mean, I -- I can

9    tell you that I have an agreement to represent

10   Southeast Independent Delivery Services.  That is

11   not privileged information that I represent

12   Southeast Independent Delivery Services.

13           So I'm just asking if there has been

14   an agreement signed by Mr. Keller for Morgan &

15   Morgan to be his attorney.  I'm asking for the --

16   if it's been signed.  I'm not asking for what it

17   says.  I'm not asking what color pen he used to

18   sign it.  I'm just asking if it exists.  I don't

19   think the existence of it is privileged

20   information.

21           MR. KLAASMEYER:  I -- I -- I disagree

22   on that and so I'm going to instruct the witness

23   not to answer the question.

24           MR. HAYES:  Okay.

25   BY MR. HAYES:

EXHIBIT 1

Page 99

1          Q.    Mr. Keller, I have asked if you have

2    signed a retention agreement with Morgan & Morgan.

3    Mr. Klaasmeyer has instructed you not to answer.

4    Do you intend to follow his instruction?

5          A.    Yes.

6          Q.    So you are refusing to answer that

7    question in accordance with his instruction.

8    Correct?

9          A.    Correct.

10          Q.    Okay.  Mr. Keller, how much money do

11    you believe that your wife is entitled to as a

12    result of the 2024 incident?

13          A.    I don't know.  I don't understand that.

14    Entitled?

15          Q.    Yes.  How much money do you believe

16    that she be awarded as a result of this lawsuit?

17          A.    I don't -- we don't have a figure on

18    that.

19          Q.    Okay.  I want you to tell me how her

20    life is different now --

21          A.    Uh-huh.

22          Q.    -- after the 2024 wreck than it was

23    after the 2022 wreck.

24          A.    The most noticeable differences are

25    her day-to-day, being ability to care for herself,

EXHIBIT 1

```
 1    washing her hair, brushing her hair.  Things like
 2    that.
 3         Q.    Can she wash her hair?
 4         A.    There are times she can and then
 5    there's times she can't, depending on pain levels.
 6    The same could be said with -- with the brushing
 7    and -- of her hair.  There's times she can and
 8    there's times she can't.  Now, to get too personal
 9    with like putting on her bra and fastening her bra,
10    you know, that she's not able to do.  I have to do
11    that or somebody does.  You know, the -- I mean,
12    you know, we have a -- we have a nice -- we have a
13    lot of property.
14              Can't walk and enjoy that very much
15    anymore at all.  Very limited where she would --
16    you know, we would walk up to a -- you know, feed
17    cows treats, apples, pears, whatever.  We were able
18    to enjoy that.  Now if she does that we -- we -- we
19    have to drive up and then she can't stand out there
20    for very long.
21              No -- no more fishing.  She cannot
22    fish anymore.  Casting a line is no longer fun.
23    Gardening, whether it's in the flower beds or -- or
24    in our -- our vegetable garden where before she was
25    able to do that, now it's with great pain.  So
```

1   that's extremely limited.  Everything she does now

2   is --  is all limited based on the pain levels that

3   she's enduring, driving, you know, whereas before

4   she was still able to drive and now she -- it's not

5   safe for her to drive.

6           Q.   Has any doctor told her that she's not

7   allowed to drive?

8           A.   I have not heard that said, no.

9           Q.   Okay.

10          A.   I'm not saying he -- they haven't, but

11  I have not heard that.

12          Q.   Have you seen any doctor's note saying

13  she cannot drive?

14          A.   I have not seen that.

15          Q.   Any other effects that you've noticed

16  since this 2024 wreck?

17          A.   Well, I mean, our intimate life is

18  cut -- cratered out to put it mildly, without

19  getting in a whole lot of detail.  That part of

20  it is no longer fun at all because of the pain.

21  Preparing meals.  You know, just basic stuff that

22  -- that people do in their day-to-day lives.  You

23  know,           it -- it really depends on the

24  pain that she's experiencing as to whether she'll

25  be able to be an active participant or just, you

EXHIBIT 1

Page 102

1    know, a bystander watching.

2          Q.    Anything else that you've noticed about

3    her since --

4          A.    Well, yeah.  We --

5          Q.    -- the vehicle wreck?

6          A.    We talked about, you know, the

7    enjoyment of shooting.  You know, she can't do that

8    anymore.  She tries, but because of the situation

9    with her hands holding a -- a good grip on -- on a

10   pistol or rifle, shotgun, she just -- she can't do

11   that.  So...

12         Q.    To your observation what is her current

13   symptom list?

14         A.    Symptoms?

15         Q.    Yes.

16         A.    As in, like, what hurts?

17         Q.    Correct.

18         A.    I mean, she wakes up every morning in

19   pain.  I mean immediately.  So it's -- it's, you

20   know, her -- her neck, her shoulders, her back,

21   her hands, her feet, her legs.  I mean it's --

22         Q.    Now, you agree with me that after the

23   2022 wreck she had pain in her neck.  Correct?

24         A.    I -- I don't recall her complaining so

25   much about her neck.  It was more in her back --

EXHIBIT 1

Page 103

```
1          Q.    Okay.

2          A.    -- and shoulders.

3          Q.    So after the 2022 wreck she had pain in

4    her shoulders.  Correct?

5          A.    Yes.  She -- I mean, she definitely was

6    hurt.

7          Q.    And after the 2022 wreck she had pain

8    in her back.  Correct?

9          A.    Yes.

10          Q.    And after the 2022 wreck she had pain

11    in her knees.  Correct?

12          A.    Yes.

13          Q.    And after the 2022 wreck she had pain

14    in her feet.  Correct?

15          A.    Foot, yes.

16          Q.    Foot?

17          A.    Yes.

18          Q.    And then after the 2022 wreck she also

19    had pain in her legs.  Correct?

20          A.    I don't recall about the legs, no.

21          Q.    Okay.  Now, I want to ask you some

22    questions about the problems that she experienced

23    after the 2022 wreck.  Did she have -- she had

24    problems -- has she given a deposition in the 2022

25    lawsuit yet?
```

EXHIBIT 1

Page 104

```
 1          A.    No.

 2          Q.    Have you given a deposition in the 2022

 3   lawsuit yet?

 4          A.    No.

 5          Q.    After the 2022 wreck she did have

 6   problems with household chores and activities.

 7   Correct?

 8          A.    Yes, but not at the levels that -- that

 9   we're currently experiencing.

10          Q.    Okay.  But similar-type issues, at

11   least for a time after the 2022 wreck with

12   gardening and that kind of thing?

13          A.    There -- there was a -- like a --

14   like -- I don't know -- a -- a two to three-week

15   period where she actually worked remotely and that

16   was a bit of a struggle.  But then she got back on

17   the horse so to speak.  And she's able to resume

18   what we'll call a normal -- you know, our normal.

19   Anyway, she went to work.  She was still able to

20   participate in activities at home.

21          Q.    Okay.  You -- you actually mentioned

22   horse.  Do y'all have horses?

23          A.    No.

24          Q.    Do y'all ride horses?

25          A.    No.
```

EXHIBIT 1

Page 105

```
1            Q.    So that was just a metaphor --

2            A.    Yes.

3            Q.    -- or analogy or -- or whatever the

4    figure of speech is?

5            A.    (Nods head.)

6            Q.    Now, after the 2022 wreck she was

7    receiving injections.  Correct?

8            A.    Yes.

9            Q.    To what parts of her body?

10           A.    I believe they were in her lower back.

11           Q.    And after the 2024 wreck she also

12   received injections.  Correct?

13           A.    Yes.

14           Q.    To what parts of her body?

15           A.    To the lower and upper back.

16           Q.    Okay.  To your knowledge has she seen

17   any doctors after the 2024 wreck that she was not

18   already seeing after the 20222 wreck?

19           A.    Yeah.  She's seeing different doctors.

20   She didn't -- she didn't see Dr. Battista as a

21   result of the 2022 wreck.

22           Q.    Okay.

23           A.    She didn't see a surgeon.

24           Q.    Okay.  But is Dr. Battista the only

25   doctor that she has added after the 2024 wreck?
```

EXHIBIT 1

Page 106

```
 1          A.    Honestly, I don't -- I don't know.

 2          Q.    Okay.  Do you have any pictures of her

 3     vehicle from the 2022 wreck?

 4          A.    I don't know --

 5          Q.    Okay.

 6          A.    -- to be honest with you.  I don't

 7     know.

 8          Q.    Was the 2022 wreck captured on video?

 9          A.    I don't know.

10          Q.    Okay.  Have you -- but you haven't --

11     in any event you haven't seen it.  Correct?

12          A.    No.

13          Q.    Have you seen the video of the 2024

14     incident?

15          A.    Yes.

16          Q.    So what is she able to do around the

17     house and the farm these days?

18          A.    Again, it's all driven by the amount

19     of pain.  She can -- from time to time, she'll like

20     prepare dinner or lunch.  Something like that.

21     Something very low -- low key.

22               As far as around -- around the farm,

23     you know, if -- if she rides up to the pastures or

24     to the stables, then yeah.  She's able to get out

25     and, you know, hand the cows some apples or, you
```

EXHIBIT 1

Page 107

1    know, hand the pigs some -- some treats.  Things

2    like that.  Same with the -- the goats.  But as far

3    as like walking up to the -- the pastures or the

4    stables, it's just not fun.  I mean, it's --

5            Q.   How do y'all get around your property?

6    Do y'all have Gators or four wheelers or --

7            A.   Not at this time, no.  So primarily it

8    would be either in our car or my son's truck.

9            Q.   Does she have any mobility-assist

10   devices like wheelchairs?  Canes?  Clutches?

11           A.   No.

12           Q.   Does she have any other orthopedic

13   supply or treatment devices such as a TENS unit or

14   anything like that?

15           A.   Yes.

16           Q.   Okay.  Which of those does she have?

17           A.   She has a TENS unit.  There is a

18   another unit that she has that circulates the cold

19   air, cold water and it kind of is like compression

20   sleeves.  And then it heats up, you know, around

21   her -- for her back.  Things like that.

22           Q.   Anything else?

23           A.   That's all I can recall at this time.

24           Q.   Are those prescribed to her or did she

25   seek those out on her own?

EXHIBIT 1

```
 1          A.    No.   They -- they were prescribed.

 2          Q.    Okay.  And those were -- you guys, did

 3   y'all get those from like a medical supply company?

 4          A.    As far as I know, they came from her

 5   doctor.

 6          Q.    Okay.

 7          A.    Doctor's office.

 8          Q.    Just one second.  Was Mrs. Keller able

 9   to make it to Chassidy's wedding?

10          A.    Yes.  Well -- well, Chassidy's wedding,

11   yes.

12          Q.    And do you know how long her long-term

13   disability has been approved for?

14          A.    I do not.

15          Q.    Okay.  And how many months ago did that

16   start?  Do you know?

17          A.    Not exactly.  No, sir.

18          MR. HAYES:  Okay.  That's all the

19   questions I have for you right now.  Mr. Klaasmeyer

20   may have some.

21              THE WITNESS:  Okay.

22              MR. KLAASMEYER:  I do not have any

23   questions for you.

24              THE VIDEOGRAPHER:  Okay.  This

25   concludes our video deposition.  Time is 12:35.
```

EXHIBIT 1

Page 109

1    We are off the record.

2              (The witness, after having been advised

3    of his right to read and sign this transcript,

4    waives that right.)

5              (The deposition was concluded at 12:35

6    PM.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 1

Page 110

```
 1   STATE OF SOUTH CAROLINA   )

 2   COUNTY OF CHARLESTON      )

 3              I, Priscilla deJesus, a Court Reporter
     and Notary Public of the State of South Carolina at
 4   Large, do hereby certify that the witness in the
     foregoing deposition was by me duly sworn to
 5   testify to the truth, the whole truth and nothing
     but the truth in the within-entitled cause; that
 6   said deposition was taken at the time and location
     therein stated; that the testimony of the witness
 7   and all objections made at the time of the
     examination were recorded stenographically by me
 8   and were thereafter transcribed by computer-aided
     transcription; that the foregoing is a full,
 9   complete and true record of the testimony of the
     witness and of all objections made at the time of
10   the examination; and that the witness was given an
     opportunity to read and correct said deposition and
11   to subscribe the same.
                Should the signature of the witness not
12   be affixed to the deposition, the witness shall
     not have availed himself of the opportunity to
13   sign or the signature has been waived.
                I further certify that I am neither
14   related to nor counsel for any party to the cause
     pending or interested in the events thereof.
15              Witness my hand, I have hereunto
     affixed my official seal on _November 13, 2025_____ at
16   Charleston, Charleston County, South Carolina.

17

18              _____
                Priscilla deJesus,
19              Court Reporter

20

     My Commission expires:
21
     December 10, 2031
22

23

24

25
```