IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| **Irene Keller,** | ) | Civil Action No.: 2:24-CV-05884-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANTS'** ***DAUBERT*** **MOTION AS** |
| v. | ) | **TO PAUL WHITE, MD** |
| | ) | |
| **Howard Anthony James and SE** | ) | **AND** |
| **Independent Delivery Services, Inc.** | ) | |
| | ) | **MOTION FOR PARTIAL SUMMARY** |
| Defendants. | ) | **JUDGMENT AS TO FUTURE MEDICAL** |
| | ) | **EXPENSES** |

**TO:** **JAMES G. BIGGART, II, ESQ., JONATHAN GRAHAM, ESQ., AND COOPER KLAASMEYER, ESQ., ATTORNEYS FOR THE PLAINTIFF, AND TO THE PLAINTIFF ABOVE-NAMED:**

**COME NOW** the Defendants, Howard Anthony James and SE Independent Delivery Services, Inc. (hereinafter "SEIDS"), who move for an Order excluding the testimony of Paul White, MD[1] and granting summary judgment as to Plaintiff's claim of entitlement to damages for future medical expenses. This Motion is made pursuant to *Daubert*, *infra*, and Fed. R. Civ. P. 56 on the grounds contained in the memorandum of law below. In accordance with Local Civ. Rule 7.04 (D.S.C.), a separate memorandum is not included because a full explanation of the motion is contained within.

**NATURE OF THE CASE**

This case arises from a 2024 automobile collision. Defendant Howard Anthony James was driving a tractor-trailer when he began changing lanes. The stair-step of the tractor grazed the wheel of Plaintiff's Mercedes SUV traveling in the same direction as Mr. James, and Mr.

---

[1] This Motion is submitted in addition to Defendants' pending Motion to Strike Paul White, MD, which was filed on other grounds. (ECF No. 35.)

James returned to his lane. The forward-facing camera depicts the minimal interaction, and experts have calculated the force as less than that required of activities of daily living. The catalyst for this case is depicted below:



### FACTS BEARING ON THE MOTION

On February 16, 2024, both Plaintiff and Defendant Howard Anthony James were traveling eastbound on Interstate 26 near the town of Harleyville, South Carolina, which is located in Dorchester County. (*See* Am. Compl. ¶¶ 9–10 [Entry No. 21].) Plaintiff was driving a Mercedes-Benz GLE sports utility vehicle, as depicted above. (*See* Irene Keller Dep. 40:11–18 [excerpts attached hereto as **Exhibit A**].) Defendant James was driving a 2024 Freightliner Cascadia bearing the SEIDS logo. (*See* Am. Compl. ¶ 9 [Entry No. 21].) Plaintiff alleges that Defendant James, while acting within the course and scope of his employment with Defendant SEIDS, and "[w]hile attempting to change lanes, . . . crashed the truck he was driving into the

passenger side of Plaintiff's vehicle." (*See* Am. Compl. ¶¶ 5, 11 [Entry No. 21].) Defendants have denied liability. (*See* Ans. to Am. Compl. ¶¶ 14–17 [Entry No. 23].)

Plaintiff has pled entitlement to damages for personal injuries related to the accident—i.e., a scratched wheel—depicted above. (*See* Am. Compl. ¶¶ 20, 27 [Entry No. 21].) Plaintiff also alleges that she is entitled to damages for "[s]ignificant past and future medical expenses." (*See* Am. Compl. ¶¶ 19, 26 [Entry No. 21].)

Plaintiff's treating physicians, Dr. Shailesh Patel and Dr. Christopher Battista testified to their recommended plan of future care. Dr. Patel testified in his deposition:

```
11   Q.   Okay. What are your current recommendations
12        for the future care that Ms. Keller may need, if any?
13   A.   It's still early to say right now, Aaron,
14        because she's still being evaluated for that stimulator
15        with Dr. Battista, so. We just need to see how effective
16        that is, if it works for her or not.
17        But assuming—let's say she doesn't get
18        that. Then right now the things that seem to be working
19        best for her I would say probably would be the steroid
20        injections and the PRP. I don't feel like she got enough
21        relief with that rhizotomy to warrant that in the future.
22        So steroid injections, PRP, PT, would be the
23        crux of the treatment.
```

(Patel Dep. 50:11–23 [excerpts attached hereto as **Exhibit B**].) Dr. Patel also testified that he has no recommendation on the frequency of these projected treatments:

```
11   Q.   Okay. But you don't have any current
12        recommendations as far as frequency of those procedures;
13        correct?
14   A.   Yeah; I don't. Because—you know, if she
15        does really well with the stimulator, for example, that's
16        [audio faded].
17   Q.   You kind of dropped out on that second half
18        of that last sentence. Could you say that one more time?
19   A.   Yeah. I was saying if she does really well
20        with the stimulator, then it's possible that she may not
21        need any.
```

(Patel Dep. 51:11–25.) Similarly, Dr. Battista testified:

| | | |
|---|---|---|
| 18 | Q. | Okay. Other than the spinal cord stimulator |
| 19 | | trial that we have talked about earlier, do you |
| 20 | | have any other recommendations for her future |
| 21 | | care that you have told her about or put in |
| 22 | | writing to her or told anyone else about, to |
| 23 | | include her counsel? |
| 24 | A. | Other than I believe in that initial note we had |
| 25 | | discussed that if the microdiscectomy did not |
| 1 | | provide her long-term relief that a lumbar fusion |
| 2 | | at L5-S1 might be a consideration. I don't |
| 3 | | believe that there was any other time that we |
| 4 | | discussed any other treatments for her down the |
| 5 | | road. Again, I would reserve the right to make |
| 6 | | some future recommendations potentially for her |
| 7 | | neck if the stimulator trial was unable to give |
| 8 | | her definitive relief, but that would be a |
| 9 | | lengthy discussion that we would have about the |
| 10 | | risks and benefits of going through with an |
| 11 | | operative intervention for decompression and |
| 12 | | fusion of a chronically damaged nerve root. |

(Battista Dep. 57:18–58:12 [excerpts attached hereto as **Exhibit C**].) However, neither Dr. Patel nor Dr. Battista intend to offer testimony about the costs of their recommended plan of care. (*See* Patel Dep. 48:10–13; Battista Dep. 62:14–25 [Exhibits B and C, respectively].)

Plaintiff instead has retained Dr. Paul White to develop a life care plan detailing future anticipated treatment and costs Plaintiff will likely incur. (Life Care Plan attached hereto as **Exhibit D**.) Dr. Paul White is a certified life care planner and medical doctor based in Atlanta, Georgia. In his brief deposition[2] on November 3, 2025, Dr. White also mentions that he is relying on his conversations with Dr. Shailesh Patel. (*See* White Dep. 5:2–8 [excerpts attached hereto as **Exhibit E**].)

---

[2] The deposition of Paul White, MD commenced on November 3, 2025 but was paused due to a late-disclosed updated report. (*See* ECF No. 35.)

Page **4** of **13**

Based on a life expectancy of 31.5 years, Dr. White projects that Plaintiff will require for the rest of her life: cervical and lumbar MRIs every three years, orthopedic pain evaluation every four months, physical therapy twelve times per year, cervical epidural steroid injections once per year, lumbar radiofrequency ablation once per year, possible C5-6 ACDF, and a possible L4-5 laminectomy/discectomy. Dr. White projects the total future medical costs at $298,229.00 plus "TBD." (Ex. D, Life Care Plan.[3])

However, for the reasons set forth in this Memorandum of Law, Dr. Paul White's methodology cannot withstand the scrutiny required under Rule 702 of the Federal Rules of Evidence. Because of this, and because of the lack of any other expert testimony regarding future medical costs, Plaintiff has failed to establish a claim of entitlement for future medical costs sufficient to withstand summary judgment.

## LEGAL STANDARD

Summary judgment is a procedural device and, as a result, the federal summary judgment standard applies in diversity cases. *See Gen. Acc. Fire & Life Assur. Corp. v. Akzona, Inc.*, 622 F.2d 90, 93 (4th Cir. 1980). "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "An issue of material fact is 'genuine' if the evidence offered is such

---

[3] Dr. White has issued two life care plans. The current life care plan is attached hereto as Exhibit D. The current life care plan is also attached as Exhibit 4 to Defendants' Motion to Strike, *see* ECF No. 35-4, and the original life care plan is attached as Exhibit 1 to Defendants' Motion to Strike, *see* ECF No. 35-1.

that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). "Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "Under this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Id.* (quoting *Anderson*, 477 U.S. at 252).

While a court ruling on a motion for summary judgment must view the evidence in the light most favorable to the non-moving party, the non-moving party may not oppose a motion for summary judgment with mere allegations or denials contained in the pleadings. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Rather, the non-moving party must "set forth specific facts" demonstrating a genuine issue for trial. *Anderson*, 477 U.S. at 248. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). In short, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

In a diversity case, "[f]ederal law determines whether the evidence is sufficient to carry the issue . . . to the jury." *McKinley v. Rawls*, 333 F.2d 198, 199 (4th Cir. 1964). However, "while the question of whether evidence is sufficient to survive summary judgment is generally a matter

of federal procedural law, 'the "expert testimony" rule' may be 'so closely interrelated with the substantive cause of action . . . that federal courts sitting in diversity cases should apply the state rule in order to fully realize state substantive policy." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litg.*, 227 F. Supp. 3d 452, 468 (D.S.C. 2017) (quoting *Hemingway v. Ochsner Clinic*, 722 F.2d 1220, 1225 (5th Cir. 1984)).

"[E]xpert witnesses have the potential to be both powerful and quite misleading." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir.1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)). Accordingly, the Supreme Court has "held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). This gatekeeping function applies to all expert testimony. *Id.*

## ARGUMENT

I. **Plaintiff has not shown sufficient indicia of the reliability of Dr. Paul White's life care plan sufficient to withstand the scrutiny mandated by *Daubert*.**

An expert witness may offer an expert opinion if the proponent can demonstrate to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has explained that "[p]roposed testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.*

The *Daubert* Court outlined several non-exclusive factors a trial judge should consider in making a determination of the reliability of an expert's testimony. These factors include:

> (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592–94). The Supreme Court has also cautioned that some of these factors may or may not be relevant in the particular determination, depending on the issues, the expert's expertise, and the subject matter. *See Kumho Tire Co.*, 526 U.S. at 150. "[T]he court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct," *Westberry*, 178 F.3d at 261, but the purpose of the *Daubert* inquiry is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Dr. White's life care plan is not based on his personal experience with Plaintiff. Dr. White has not personally evaluated Plaintiff. Instead, Dr. White relies upon (1) the South Carolina Traffic Collision Report generated as a result of the 2024 accident; (2) Trident Medical Center records; (3) Southeastern Spine Institute records; (4) Palmetto Primary Care records; (5) Lowcountry Orthopedics records; (6) Atlas Physical Therapy records; and (7) Plaintiff's surgical and imaging history following the 2024 accident. (Ex. D, Life Care Plan.) Additionally, in his brief deposition on November 3, 2025, Dr. White also mentions that he is relying on his conversations with Dr. Shailesh Patel. (*See* Ex. E, White Dep. 5:2–8.)

Based on a life expectancy of 31.5 years, Dr. White projects that Plaintiff will require for the rest of her life: cervical and lumbar MRIs every three years, orthopedic pain evaluation every

four months, physical therapy twelve times per year, cervical epidural steroid injections once per year, lumbar radiofrequency ablation once per year, possible C5-6 ACDF, and a possible L4-5 laminectomy/discectomy. Dr. White projects the total future medical costs at $298,229.00.

As already noted, Dr. White has not personally evaluated Plaintiff. Critically, Dr. Patel does not recall speaking with Dr. White at any point related to this case. (*See* Ex. B, Patel Dep. 50:4–10.) Neither does Dr. Battista. (*See* Ex. C, Battista Dep. 20:15–17.) The issue of Dr. White's reliability as it relates to his life care plan is very similar to what the Southern District of Illinois encountered in *Queen v. W.I.C, Inc.*, Case No. 14-CV-519-DRH-SCW, 2017 WL 3872180 (S.D. Ill. Sep. 5, 2017).[4] In *Queen*, the Southern District of Illinois found that the plaintiff failed to demonstrate the reliability of his life care planner, Dr. BiFulco, who concocted a life care plan based on a review of the plaintiff's medical records and a single two-hour examination of the plaintiff. *Id.*, 2017 WL 3872180, at *4. The court explained that "[a]n expert must explain the methodology and principles supporting his opinion, and that opinion must amount to 'more than a bottom line.'" *Id.* (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). "Dr. BiFulco's recommended care plan suggests multiple treatments that are neither supported by [the plaintiff's] medical records, nor recommended by [the plaintiff's] treating physicians." *Id.* The court found that Dr. BiFulco's methodology was clearly unreliable. The court noted that "[n]one of [the plaintiff's] treating physicians recommended th[e] proposed treatments; Dr. BiFulco never ordered any additional diagnostic tests; Dr. BiFulco never spoke to [the plaintiff] after that initial examination; he never spoke to any of [the plaintiff's] family members; and he never spoke to [the plaintiff's] treating physicians." *Id.* In that case:

---

[4] Pursuant to Local Civil Rule (D.S.C.) 7.05(C)(2), a copy of this decision is attached as **Exhibit F**.

> It is undisputed that BiFulco did not conduct any scientific tests or experiments in order to arrive at his conclusions about [the plaintiff's] life care plan. He simply relied on his template to develop the plan without any indication as to the methods or basis for his additional treatment suggestions. There is no indication that his methods can or have been tested, and no indication that his methodology has been generally accepted in the scientific community. He also fails to indicate that his methods and reporting style have been peer reviewed.

*Id.* The court therefore found that Dr. BiFulco's testimony should be excluded since "[a]n opinion without foundation in the record has no probative value, and so is neither relevant within the meaning of Rules 401 and 402 nor helpful to the trier of fact within the meaning of Rule 702." *Id.* at *5.

Dr. White's conclusions similarly turn on his review of the medical records. But, unlike the life care planner in *Queen*—who was excluded—Dr. White has not conducted a personal evaluation of Plaintiff in this case. Furthermore, Dr. White proposes treatment that Plaintiff's treating physicians have not recommended. For example, Dr. White indicates that Plaintiff may need a C5-6 ACDF.[5] (Ex. D, Life Care Plan, at p. 24.) Contrarily, Dr. Battista testified in his deposition that he has never discussed a fusion surgery at C5-6 with Plaintiff. (*See* Ex. C, Battista Dep. 20:9–14.) Dr. Patel has also not recommended a C5-6 ACDF surgery. Instead, Dr. Patel mentioned the possibility of steroid injections, platelet rich plasma injections, and physical therapy. (*See* Ex. B, Patel Dep. 50:11–23.) Dr. Battista mentioned a possible lumbar fusion surgery at L5-S1. Dr. Battista also mentioned the potential for neck decompression and fusion surgery, but explicitly cautioned that such a possibility would involve an extensive conversation with Plaintiff about the risks and benefits. (*See* Ex. C, Battista Dep. 57:18–58:12.)

---

[5] An "ACDF" is an anterior cervical discectomy and fusion. Beth Karasin, MSN, APN, AGACNP-BC, CNOR & Monica Grzelak DNP, APN, AGACNP-BC, *Anterior Cervical Discectomy and Fusion: A Surgical Intervention for Treating Cervical Disc Disease*, Aorn Journal (2021) https://aornjournal.onlinelibrary.wiley.com/doi/10.1002/aorn.13329.

Dr. White also relies upon a conversation with Plaintiff's treating physician Dr. Patel that—according to Dr. Patel—did not occur. Dr. Patel stated that "I don't see anything in my chart saying I've spoken with [Dr. White], so I'm guessing not." (Ex. B, Patel Dep. 50:8–10.) Dr. Battista stated that he has no recollection of any conversation with Dr. White. (*See* Ex. C, Battista Dep. 20:15–17.)

Simply put, like in *Queen*, Dr. White's methodology has not been proven reliable. He merely offers a "bottom line." Expert testimony without sufficient indicia of reliability would mislead the jury and cause significant prejudice to Defendants, especially when that expert intends to testify to anticipated future medical costs of $298,229.00 plus "TBD." Therefore, the Court should exercise its gatekeeping function by ruling Dr. White's current life care plan and corresponding testimony inadmissible.

## II.     Apart from Dr. White, Plaintiff offers no expert testimony as to future medical costs.

Defendants will not belabor the point. Simply put, aside from Dr. White, Plaintiff offers no expert who intends to offer an opinion as to the costs of any care and procedures performed to date or recommended in the future. Dr. Battista testified that he does not intend to offer any such opinions and does not know what those costs are because "[t]hat's not anything that [he] ha[s] anything to do with really." (*See* Ex. C, Battista Dep. 62:14–25.) Dr. Patel also testified in his deposition that he has no intention of offering any testimony to the jury about the reasonableness of the costs of services that he provided. (*See* Ex. B, Patel Dep. 48:10–13.)

The existence and reasonableness of Plaintiff's future medical costs are certainly not within the province of a lay jury. Without any expert testimony that is reliable and helpful to the jury, the jury is only left to speculate. Such speculation is impermissible. Therefore, this is an issue ripe for summary judgment, especially at this stage of the litigation.

As of the date of this motion, the discovery deadline has passed. The parties have deposed Plaintiff, Plaintiff's husband, Defendant James, and six proposed expert witnesses. There has been an adequate time for discovery into the matter. Still, Plaintiff has not put forth any evidence to properly establish her claim of entitlement to damages for future medical costs. It is *Celetox*-style claims such as these that warrant summary judgment.

## CONCLUSION

Plaintiff's claim of entitlement to damages for future costs is unsupported by reliable expert testimony. Dr. White's methodology in preparing his life care plan is not well-grounded. Dr. White did not personally evaluate Plaintiff. Dr. White references conversations with Dr. Patel that either (1) did not occur or (2) at best, Dr. Patel has no recollection of. Further, there is no record of any conversations between Dr. White and Dr. Battista. Dr. White also recommends treatment that is different from Plaintiff's treating physicians' recommendations. The Court should thus exercise its gatekeeping function to exclude unreliable and potentially misleading expert testimony.

Apart from Dr. White, Plaintiff offers no other reliable expert testimony establishing her alleged future medical costs. A fact-finder's review is unnecessary on the issue. Therefore, Defendants respectfully request that this Court exclude Dr. White's life care plan and testimony and grant Defendants summary judgment as to Plaintiff's claim for future medical costs as a matter of law.

*Signature page to follow.*

Respectfully submitted,

**SWEENY, WINGATE & BARROW, P.A.**

s/ Aaron J. Hayes
Mark S. Barrow (Fed ID No.: 1225)
msb@swblaw.com
Aaron J. Hayes (Fed ID No. 11196)
ajh@swblaw.com
Jacob M. Kaufman (Fed ID No. 14615)
jmk@swblaw.com
Post Office Box 12129
Columbia, SC 29211
(803) 256-2233

**ATTORNEYS FOR THE DEFENDANTS**

Columbia, South Carolina

February 10, 2026