```
 1           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION

 3
                DEPOSITION OF MICHAEL PEELLE, MD
 4                   DECEMBER 9, 2025

 5    IRENE KELLER,

 6
                    Plaintiff,
 7

 8        vs.              CASE NO. 2:24-CV-05884-DCN

 9
      HOWARD ANTHONY JAMES AND
10    PENSKE TRUCK LEASING CO.,

11
                    Defendants.
12
      _____
13

14

15    TIME:            3:58 P.M.

16

17
      LOCATION:        VIDEOCONFERENCE
18

19

20    REPORTED BY:     IVY SCHLICHER
                       CLARK BOLEN
21                     CHARLESTON, SC 29415
                       (843) 762-6294
22                     WWW.CLARKBOLEN.COM

23

24

25
```

1  this case that any treatment subsequent to the
2  2024 accident is not related to the 2024
3  accident?
4     A.  I don't know about any treatment, but I
5  would say any long-term treatments required for
6  this condition would be related to the pre-injury
7  status of her spine and ongoing problems related
8  to the lumbar spine extending as, you know, early
9  as 2022.
10    Q.  Okay.  So when you say long-term
11 treatment, that implies that you believe that
12 some treatment was related to the 2024 accident.
13 So what treatment do you believe was reasonably
14 related to the 2024 accident?
15    A.  After any accident, I certainly would
16 believe that any sorts of noninvasive therapy
17 treatments may be appropriate.  Medication
18 options in the early stages for
19 anti-inflammatories or muscle relaxers may be
20 appropriate.
21        And then I think it's reasonable to
22 consider short-term injections for a flare-up of
23 an underlying condition.  This might include the
24 lumbar epidural steroid injection that was
25 completed in April of 2024.

1        But as the treatments progressed over
2   time, there becomes an increasing gap in time
3   between the date of accident and when the
4   treatments are rendered.  Therefore, it becomes
5   harder to discern what is a problem with the
6   underlying degenerative condition or chronic
7   condition versus what was, quote, aggravated from
8   the 2024 accident.  So if you're rendering
9   treatments and perhaps a year later or many
10  months later, it's certainly causing the question
11  what is that causation or direct need for that
12  treatment.
13        Q.  Okay.  So just to make sure I understand
14  your opinions, the treatment that she received
15  prior to and up until October of 2023 was related
16  to the 2022 crash based on your review of the
17  medical records?
18        A.  Yes.  And her underlying degenerative
19  condition, of course.
20        Q.  Okay.  And her underlying degenerative
21  condition.
22        And then the treatment she received in
23  the short-term after the crash in 2024 was
24  related to the 2024 crash up until that lumbar
25  epidural steroid injection that you talked about,

1   right?

2      A.   Yes.

3      Q.   And then so after that point, it's your

4   opinion that the treatment went back to being

5   related to her underlying chronic condition

6   and/or the 2022 collision?

7      A.   I'm saying it's impossible to dissect

8   the long-term implications of her underlying

9   degenerative condition and the 2022 accident

10  because those are times when she had a clear

11  lower back and neck issue documented and treated.

12  And so if an MRI or imaging studies don't

13  appreciatively change after another event, most

14  of the problems are a continuum of the

15  preexisting condition.

16     Q.   Okay.  But I'm trying to understand --

17  because you shared with me a moment ago a list of

18  treatments that you believe were related to the

19  2024 crash, right?

20     A.   I highlighted one, yes.

21     Q.   Okay.  And so I believe what you

22  highlighted was specifically the lumbar epidural

23  steroid injection following the 2024 crash,

24  right?  The first one.

25     A.   Yes.  That's one example.  Yes.

1              MR. HAYES:  Object to form.
2         A.   Yes.  I can do that.
3         Q.   Okay.  All right.  And so we've gone
4    over the course of treatment up to the first
5    lumbar ESI, and so my -- what I need to
6    understand before we go to the trial of this case
7    is which ones you relate to this crash and which
8    ones you do not relate to the crash.
9              So the ER visit.  Do you relate the ER
10   visit to this crash?
11        A.   Yes.
12        Q.   Okay.  And was that reasonable and
13   necessary treatment for the injuries suffered by
14   Ms. Keller in this crash?
15        A.   Yes.
16        Q.   Okay.  Was the initial visit with
17   Dr. Patel a reasonable and necessary treatment
18   for the injuries suffered by Ms. Keller in this
19   crash?
20        A.   Yes.
21        Q.   Were the MRIs reasonable and necessary?
22        A.   Yes.
23        Q.   Was physical therapy reasonable and
24   necessary?
25        A.   Yes.

1    Q.  Got it.
2        Were the medications prescribed
3    reasonable and necessary?
4    A.  In the several weeks or -- following the
5    accident?
6    Q.  Let's say up until April when the first
7    lumbar ESI was performed.
8    A.  Okay.  I'll say yes.
9    Q.  Okay.  Was the lumbar ESI performed in
10   April reasonable and necessary to treat the
11   injuries suffered by Ms. Keller in this crash?
12   A.  Yes.
13   Q.  Okay.  So now we've gotten past that
14   initial time period that you and I discussed, and
15   so now we're into May.
16       Was the cervical epidural steroid
17   injection reasonable and necessary to treat
18   Ms. Keller for the injuries she suffered in this
19   crash?
20   A.  I don't think so.
21   Q.  Okay.  Why not?
22   A.  Well, the cervical MRI demonstrated no
23   structural injury as a result of this crash.
24   There is no evidence of nerve impingement that
25   would warrant a cervical epidural steroid